DAVID L. HENKIN          #6876
KYLIE W. WAGER CRUZ      #10165
ELENA L. BRYANT         #9548
EARTHJUSTICE
850 Richards Street, Suite 400
Honolulu, Hawai'i 96813
T: (808) 599-2436
Email: dhenkin@earthjustice.org
       kwager@earthjustice.org
       ebryant@earthjustice.org

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF HAWAI'I

| | |
|---|---|
| KĀPA'A, CONSERVATION COUNCIL FOR HAWAI'I, and CENTER FOR BIOLOGICAL DIVERSITY, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States; HOWARD LUTNICK, in his official capacity as Secretary of Commerce of the United States; LAURA GRIMM, in her official capacity as Acting Administrator of the National Oceanic and Atmospheric Administration; EUGENIO PIÑEIRO SOLER, in his official capacity as Assistant Administrator for NOAA Fisheries; and DOUG BURGUM, in his official capacity as Secretary of the Interior of the United States, <br><br> Defendants. | CASE NO. CV 25-00209 <br><br> COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      This case challenges President Donald J. Trump's unlawful Proclamation 10918 of April 17, 2025 ("Trump Proclamation"), which purports to strip core protections from the Pacific Islands Heritage Marine National Monument ("the Monument")[1] and to open the Monument to commercial fishing. *See* Proclamation 10918 of April 17, 2025, 90 Fed. Reg. 16,987 (Apr. 22, 2025). This case also challenges actions by the Trump Administration to implement the Trump Proclamation.

2.      The Trump Proclamation purports to allow commercial fishing in the waters from 50 to 200 nautical miles around Wake Island, Jarvis Island, and Johnston Atoll that President Barack H. Obama added to the Monument in 2014 ("Monument Expansion"). *See* Proclamation 9173 of September 25, 2014, 79 Fed. Reg. 58,645 (Sept. 29, 2014) ("the 2014 Proclamation")

3.      President George W. Bush established the Monument in 2009. *See* Proclamation 8336 of January 6, 2009, 74 Fed. Reg. 1,565 (Jan. 12, 2009) ("the 2009 Proclamation"). To establish and expand the Monument, both Presidents

---

[1] The Monument was formerly known as the Pacific Remote Islands Marine National Monument. *See* Proclamation 10880 of January 2, 2025, 90 Fed. Reg. 2,575 (Jan. 13, 2025).

Bush and Obama acted pursuant to the Antiquities Act of 1906, 54 U.S.C. §§ 320301-03.



**Figure 1: 2009 Monument Creation and 2014 Monument Expansion**
(Credit: National Geographic)

4.    The Monument, which lies in the Pacific Ocean to the south and west of the Hawaiian Islands, originally included the lands, waters, and submerged and emergent lands of Wake, Baker, Howland, and Jarvis Islands, Johnston Atoll, Kingman Reef, and Palmyra Atoll, to lines of latitude and longitude that lie approximately 50 nautical miles from the islands' mean low water lines. The

2

designation provided needed protection to a wide variety of scientific and historical treasures in one of the most spectacular and unique ocean ecosystems on earth.

5.      The 2009 Proclamation states in pertinent part: "The Secretaries of Commerce and the Interior shall not allow or permit any appropriation, injury, destruction, or removal of any feature of this monument except as provided for by this proclamation and **shall prohibit commercial fishing within boundaries of the monument**." (Emphasis added).

6.      Prior to the 2009 Proclamation, Baker, Howland, and Jarvis Islands, Johnston and Palmyra Atolls, and Kingman Reef themselves had been managed as National Wildlife Refuges by the United States Fish and Wildlife Service ("USFWS") within the Department of Interior.

7.      The 2009 Proclamation assigned management of the nearshore waters and submerged and emergent lands of the islands to the Department of the Interior. On January 16, 2009, Secretary of the Interior Dirk Kempthorne issued Secretarial Order 3284, declaring that the areas assigned to the Department of Interior by the 2009 Proclamation will be managed as a National Wildlife Refuge. This expanded the areas managed as National Wildlife Refuges to include submerged lands out to 12 nautical miles from the islands.

8.      On September 27, 2014, President Barack H. Obama issued the 2014 Proclamation, which expanded the Monument to include the waters and submerged

lands of Jarvis and Wake Islands and Johnston Atoll that lie from the boundary

established in the 2009 Proclamation to the seaward limit of the U.S. Exclusive

Economic Zone ("EEZ") of each island ("Monument Expansion").

9.      The 2014 Proclamation reserved and protected a highly pristine deep

sea and open ocean ecosystem with unique biodiversity. The Monument Expansion

has more than 130 undersea mountains (called "seamounts") that provide

important opportunities for scientific exploration and study. The seamounts are

home to colonies of deepwater corals many thousands of years old and for species

found nowhere else on Earth, including species that are new to science.



**Figure 2: Corals and Sponges in Monument Expansion near Jarvis Island**
(Credit: NOAA Office of Ocean Exploration and Research)

10.     The Monument Expansion provides vital habitat and foraging areas for tunas, turtles, manta rays, sharks, seals, whales, dolphins, and seabirds, including species protected as endangered or threatened under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq.* Seabirds from some of the world's largest remaining colonies have evolved with a foraging technique that depends on schools of tuna and other large marine predators to drive prey fish and squid to the surface, where they are easily caught by the seabirds. The Monument Expansion's prohibition on commercial fishing thus helps ensure seabirds' access to food.

11.     The Monument Expansion's pristine waters provide a baseline comparison for important scientific research that monitors and evaluates impacts of global climate change, including benchmarking coral bleaching and ocean acidification.

12.     To protect these unique and fragile resources, the 2014 Proclamation bans all commercial fishing in the Monument Expansion. The proclamation states in pertinent part: "The Secretaries of the Interior and Commerce shall not allow or permit any appropriation, injury, destruction, or removal of any object of the Monument Expansion except as provided for by this proclamation and ***shall prohibit commercial fishing within the boundaries of the Monument Expansion***." (Emphasis added).

5

13.     On August 31, 2016, Secretary of the Interior Sally Jewell issued Secretarial Order 3284, Amendment 1, which, among other actions, extended the management as units of the National Wildlife Refuge System of the lands and waters of Jarvis and Wake Islands and Johnston Atoll to the limits of the U.S. EEZ, corresponding to the boundary changes of the Monument Expansion.

14.     The Trump Proclamation unlawfully seeks to reverse the 2014 Proclamation's ban on commercial fishing, purporting to open the Monument Expansion—which represents more than 80% of the Monument's total area—to activities that are incompatible with the proper care and management of the objects of scientific or historic interest identified in the 2014 Proclamation and protected by the Monument Expansion's reservation. The Trump Proclamation deprives the Monument Expansion's scientific objects of the protections they had under the 2014 Proclamation, leaving them vulnerable to the very damage that the Monument reservation was designed to avoid.

15.     Although President Trump invoked the Antiquities Act and the U.S. Constitution as sources of authority, neither authorizes the Trump Proclamation. The Antiquities Act empowers the President to *create* national monuments and *reserve* federally owned or controlled lands and waters to protect objects of historic or scientific interest. It does not give the President the opposite power to *revoke* those protections. Congress retained that latter power for itself. The Trump

Proclamation is without statutory or constitutional authority and is therefore unlawful.

16.     This case also challenges the actions of the Secretaries of Commerce and of the Interior, the National Oceanic and Atmospheric Administration ("NOAA"), and NOAA Fisheries (more commonly known as the National Marine Fisheries Service ("NMFS")) (collectively, "Agency Defendants") to carry out the Trump Proclamation's illegal directives. On April 25, 2025, NMFS sent a letter to fishing permit holders that purported to open the Monument Expansion to commercial fishing immediately, notwithstanding that federal regulations implementing the 2014 Proclamation's commercial fishing ban remain on the books. NMFS failed to engage in notice-and-comment rulemaking to revise the regulations and open the Monument Expansion to commercial fishing, in violation of the Magnuson-Stevens Fishery Conservation and Management Act ("Magnuson-Stevens Act"), 16 U.S.C. §§ 1801 *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.*

17.     Before making its decision regarding the types of commercial fishing that it would allow in the Monument Expansion and under what conditions, NMFS failed to comply with its mandatory duty under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, to take a hard look at the environmental impacts of its proposed course of action and to consider reasonable alternatives

that might have fewer adverse impacts. NMFS also violated its mandatory duty under the ESA to reinitiate consultation to ensure that its proposed course of action would not jeopardize the continued existence of any of the endangered or threatened species found in the Monument Expansion.

18.    NMFS's failure to comply with NEPA and the ESA violated its duty under the Magnuson-Stevens Act to ensure that all actions to regulate commercial fishing—whether denominated as a fishery management plan, plan amendment, or implementing regulation—comply with applicable law. Assuming for the sake of argument that the Trump Proclamation is valid, NMFS's actions purporting to implement it were contrary to the proclamation's directives, further violating the agency's duty to ensure compliance with applicable law.

19.    This Court should declare the Trump Proclamation to be unlawful and hold unlawful and set aside NMFS's actions to implement the proclamation's directives. The Court should further enjoin Agency Defendants from implementing the Trump Proclamation and from taking any action inconsistent with the 2014 Proclamation.

<u>JURISDICTION AND VENUE</u>

20.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction); 28 U.S.C. § 1361 (actions to compel officers of the United States to perform their duty); 28 U.S.C. §§ 2201-2202 (power to

issue declaratory judgments in cases of actual controversy); 16 U.S.C. §§ 1855(f), 1861(d) (actions under the Magnuson-Stevens Act); and 5 U.S.C. §§ 701-706 (actions under the APA).

21.    The Magnuson-Stevens Act provides that fishing regulations promulgated by the Secretary of Commerce under the statute and actions that the Secretary of Commerce takes under regulations which implement a fishery management plan shall be subject to judicial review "if a petition for such review is filed within 30 days after the date on which the regulations are promulgated or the action is published in the Federal Register, as applicable." 16 U.S.C. § 1855(f). NMFS sent its letter to fishing permit holders, purporting to change the regulations that govern fishing in the Monument without notice-and-comment rulemaking and to open the Monument Expansion to commercial fishing immediately, on April 25, 2025. In case 16 U.S.C. § 1855(f) applies, Plaintiffs are filing this complaint within thirty (30) days of NMFS's issuance of its letter.

22.    This Court has the authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, and may also grant relief pursuant to the Magnuson-Stevens Act, 16 U.S.C. §§ 1855(f) and 1861(d), as well as the APA, 5 U.S.C. § 706.

23.    The Court has authority to award costs and attorneys' fees under 28 U.S.C. § 2412.

24.     Venue is proper in this district under 28 U.S.C. § 1391(e), because one or more plaintiffs reside in this district, and this is a civil action in which officers or employees of the United States or an agency thereof are acting in their official capacity or under color of legal authority and a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

PARTIES

25.     Plaintiff Kāpaʻa is a hui, or unincorporated association, of Native Hawaiian cultural practitioners, the members of which reside in Hawaiʻi. Kāpaʻa was formed to support the creation, protection, and expansion of marine national monuments in the Central Pacific, including the Monument, and to oppose efforts to remove protections from these monuments.

26.     Kāpaʻa members include Native Hawaiian cultural practitioners who have studied and worked to protect islands, atolls, reefs and marine waters in and around the Polynesian archipelago, from the Northwestern Hawaiian Islands to the South Pacific, including the offshore waters within the Monument Expansion. Kāpaʻa members derive cultural, spiritual, religious, educational, subsistence, recreational, and aesthetic benefits from those activities. Kāpaʻa members also have cultural and familial ties to the Monument and have plans to visit the Monument, including but not limited to Jarvis Island, in the near future to deepen these ties and study, work, recreate, and exercise their culture. As discussed below,

the Trump Proclamation and NMFS's action to open the Monument Expansion to commercial fishing harm Kāpaʻa's members' use and enjoyment of the Monument and will continue to do so as long as commercial fishing in the Monument Expansion is permitted.

27.     Kāpaʻa members firmly believe that the islands within the Monument are part of Moananuiākea, a term used to describe the Pacific Ocean that connects the indigenous peoples of the Pacific to one another. Kāpaʻa members are Native Hawaiians who are connected genealogically to the indigenous peoples of the Pacific through a common voyaging heritage and a common cosmology via their oral histories and through the Kumulipo, the Native Hawaiian creation story. Through the Kumulipo and the belief that indigenous peoples are connected through Moananuiākea, members of Kāpaʻa have close ties to islands within the Monument arising out of their heritage and their past, present, and future use of these islands—including the islands' nearshore and deep-sea ecosystems—for activities that are necessary to support and perpetuate their cultural heritage.

28.     At least one Kāpaʻa member has advocated for over a decade to uphold and expand the protections of the Monument by serving as a cultural expert on the Pacific Remote Islands community group, assembled by the federal government to create a management plan for the islands within the Monument. Through this member, Kāpaʻa has communicated with state and federal

administrative agencies and Hawaiʻi congressional delegation members about the management, proper care, and effective stewardship of the Monument by contributing important cultural perspectives and practices regarding marine resource management.

29.    Members of Kāpaʻa plan to use the lands and waters within the Monument for cultural, spiritual, religious, subsistence, recreational, educational, and aesthetic activities, including, but not limited to, voyaging canoe wayfaring, collecting natural materials used in traditional Native Hawaiian cultural practices, subsistence fishing, religious rituals and spiritual practices, and monitoring spawning seasons and distributions of marine species.

30.    One Kāpaʻa member also has a deep personal connection to the islands within the Monument. This member's uncle was part of Hui Panalāʻau, a group of Native Hawaiian civilians who were sent to the islands of Howland, Baker, and Jarvis in 1935 to 1942 to occupy these lands as colonizers for the United States. Hui Panalāʻau established a colony on these islands and survived by living off the land. They also recorded weather conditions, cultivated plants, observed and recorded marine and bird life, and collected specimens for the Bishop Museum on Oʻahu. This member's uncle was ultimately killed on Howland Island after succumbing to injuries sustained in the Japanese bombing of Howland, Baker, and Jarvis Islands on December 8, 1941.

31.    Kāpaʻa members have planned a voyage to the islands of Howland and Jarvis that will take place sometime during the period from the winter of 2025 to spring of 2026. At least one Kāpaʻa member will participate in this voyage. A return to these islands is an important acknowledgement of Kāpaʻa members' ancestors who spent time there and will allow Kāpaʻa members to deepen their cultural connection to these places. This voyage will provide important traditional navigation education and experience and allow Kāpaʻa members to kilo (observe and assess) culturally and ecologically significant marine resources on their journey, to engage in cultural protocol and spiritual ceremony, and to participate in other recreational and aesthetic activities such as viewing and observing marine wildlife in their unspoiled natural habitat.

32.    The Trump Proclamation and NMFS's action to allow commercial fishing in the Monument Expansion adversely affects Kāpaʻa's cultural, spiritual, religious, subsistence, educational, recreational, and aesthetic interests in having the opportunity to experience these culturally significant and pristine protected areas, and their abundant wildlife and intact ecosystems.

33.    Most immediately, commercial fishing will make Kāpaʻa members' upcoming voyage less culturally fulfilling by disturbing the natural, intact marine ecosystems in the Monument Expansion around Jarvis Island and preventing members from experiencing traditional navigation throughways undisturbed by

commercial activities. Upsetting the pristine marine ecosystems in the waters around Jarvis Island will also injure Kāpaʻa's educational, recreational, and aesthetic interests by preventing members from observing, studying, recording, and documenting marine species in their natural habitats, unaffected by commercial activity.

34.     The practice of commercial fishing and the unavoidable and significant waste of marine resources caused by commercial fishing bycatch is an affront to Kāpaʻa members' cultural, spiritual, religious and subsistence-based beliefs. Expanding commercial fishing in the Monument Expansion to these areas prioritizes short-term gain over making the resource protection investments required to ensure abundant food from the sea for our children and our children's children. Allowing unsustainable commercial fishing practices in the Monument Expansion, particularly with respect to bycatch, will waste significant amounts of valuable resources, harm marine ecosystems, and upset the necessary balance of the ocean. Allowing commercial fishing in the Monument Expansion thus poses an existential threat to the cultural practices of ʻāina momona (i.e., setting aside areas for resources to rest and replenish so future generations can thrive) and aloha ʻāina (i.e., love for the land) that are central to Kāpaʻa members' cultural, spiritual, religious, and subsistence-based beliefs.

35.    Plaintiff Conservation Council for Hawaiʻi ("CCH") is a non-profit citizens' organization based in Hawaiʻi with approximately 4,000 members in Hawaiʻi, the United States, and foreign countries. CCH is the Hawaiʻi affiliate of the National Wildlife Federation, a non-profit membership organization with over 5.8 million members and supporters nationwide.

36.    CCH's mission is to protect Hawaiʻi's ecosystems and native wildlife, including threatened and endangered species, and to restore the ecosystems on which those species depend for future generations. The wildlife species that CCH has worked to protect include species of tunas, sharks, rays, whales, dolphins, seals, seabirds, sea turtles, and corals that will be harmed by allowing commercial fishing within the Monument. CCH's activities to protect these species include testifying at the state legislature on various bills relating to the protection of the environment, testifying before administrative agencies on proposed regulations relating to species conservation, communicating with Hawaiʻi's congressional delegation and staff, reviewing and commenting on environmental documents, supporting scientific studies and research, engaging in field work to survey Hawaiʻi's natural resources, participating in service projects to protect native species and ecosystems, and preparing educational materials.

37.     CCH has been involved in numerous efforts to create, expand, and protect national monuments in the Pacific region, including the efforts to establish the Monument in 2009 and to expand it in 2014.

38.     CCH members include marine biologists and Native Hawaiian cultural practitioners who have visited, studied, worked, and recreated in areas within the Monument and derive recreational, professional, scientific, educational, and aesthetic benefits from those activities. CCH members' use and enjoyment of the Monument for these purposes will be harmed by commercial fishing in the Monument Expansion.

39.     For example, one of CCH's members has conducted extensive scientific research within the Monument for more than two decades. This member has personally participated in numerous scientific research trips to all islands within the Monument.

40.     Wake Island, Jarvis Island, and Johnston Atoll have distinct, unparalleled ecological indicators for fish biomass, coral cover, and microbes, and are located along the equator, directly in line with wind and current patterns that can lead to thermal events. Because of their geographic location and pristine environments, these islands provide unique laboratories for CCH's member and other scientists to study how coral reefs respond to and recover from thermal events.

41.    CCH's member has been to Wake Island twice and has plans to visit again sometime during the next two years to collect data and imagery on coral reefs and build upon his research team's prior data collection efforts on Wake. The member will also continue his research on the imperiled bumphead parrotfish. Wake Island is home to the largest population of bumphead parrotfish in the United States, and one of the largest populations in the world, due to island's protected status within the Monument and its expansive sheltered lagoon. The member's research will be undermined by commercial fishing in the offshore areas around Wake. Allowing commercial fishing closer to shore will increase threats to the bumphead parrotfish and their habitats from derelict fishing gear. The resulting decline in bumphead parrotfish will make it difficult for the member to study an intact population of bumphead parrotfish, which is essential for his research.

42.    This member has also participated in research trips to Jarvis Island in 2001, 2002, and 2010, and is returning to Jarvis for another research trip no later than 2030. Because commercial fishing has (until now) been banned in the full exclusive economic zone around Jarvis since 2014, it is the only location in the United States where the member can study a pristine marine ecosystem's ability to recover from a recent, largescale coral mortality event. Resuming commercial fishing in the offshore waters around Jarvis would undermine the member's ability to achieve his research objectives, further injuring his professional interests.

43.     Plaintiff Center for Biological Diversity ("the Center") is a non-profit environmental organization founded in 1989 and dedicated to the protection of native, threatened and endangered species and their habitats through science, policy, and environmental law. The Center is incorporated in California and headquartered in Tucson, Arizona, with field offices throughout the United States and Mexico, including in Honolulu, Hawai'i. The Center has over 90,000 members, including members in Hawai'i and American Samoa dedicated to the protection and restoration of imperiled species and wild places.

44.     The Center and its members are concerned with the conservation of marine ecosystems and imperiled species, including ones that will be adversely affected by the Trump Proclamation and NMFS's action to allow commercial fishing within the Monument Expansion. The Center has been involved in numerous efforts to create, expand, and protect national monuments on land and sea, including the efforts to establish and expand the Monument in 2009 and 2014, respectively. The Center has also been involved in many lawsuits and campaigns to protect the wildlife that will be harmed by allowing commercial fishing within the Monument, including tunas, sharks, rays, whales, dolphins, seals, seabirds, sea turtles, and corals.

45.     Members of the Center have visited, studied, worked, and recreated in areas within the Monument and derive recreational, professional, scientific,

educational, and aesthetic benefits from those activities. For example, one of the Center's members has been conducting scientific research within the Monument for more than twenty years. This member and his research team have, collectively, visited all islands within the Monument, many on multiple occasions, to carry out their research.

46.    As part of his research, this member participated in a research trip to Jarvis Island in 2010, other members of the research team visited Jarvis in 2017 and 2018, and the member is returning to Jarvis for a follow-up research trip in the near future, no later than 2030. Jarvis is the only place in the United States where the member can conduct aspects of his research, in part because of the island's protected status prohibiting commercial fishing in the full exclusive economic zone around Jarvis since 2014.

47.    This member also plans to visit Wake Island no later than 2028 to collect data and imagery on coral reefs and build upon the research team's prior data collection efforts on Wake. As with Jarvis Island, opening the 50 to 200 nautical mile zone around Wake to commercial fishing will harm the member's ability to study remote marine ecosystems by adding a substantial variable that harms the pristine condition of the marine waters surrounding the island.

48.    During his upcoming research trip to Wake, this member will also collect data on the effectiveness of recent rodent eradication efforts. Rodents on

Wake were killing wildlife including imperiled seabirds, which reduced guano (bird excrement) and the supply of important nutrients to the land and nearshore marine ecosystem. Opening the offshore areas around Wake to commercial fishing will undermine efforts to revive seabird populations on Wake by removing offshore foraging areas for seabirds, subjecting seabirds to bycatch from commercial fishing, and changing the behavior of pelagic fish schools (*e.g.*, tunas) on which seabirds rely to chase prey fish to the ocean surface. Without court intervention to stop commercial fishing in the pelagic waters around Wake, seabird populations will suffer challenges to feeding in critical, offshore foraging habitats, hindering the member's ability to assess impacts of island restoration efforts on seabird populations and knock-on effects on coral reef ecosystem health.

49.    Resuming commercial fishing in the offshore waters around Jarvis and Wake would undermine research being conducted by members of both CCH and the Center, injuring their professional interests. Prompt action to stop commercial fishing in the pelagic waters around Jarvis and Wake is necessary to salvage these ongoing and future research efforts and prevent further professional injury. These members will also suffer aesthetic and recreational injury on future trips to these islands by being deprived of the opportunity to experience some of the last remaining wild and healthy ocean ecosystems on Earth, and the abundant wildlife and megafauna within them.

20

50.    Kāpaʻa, CCH, and the Center (collectively, "Plaintiffs"), as well as their individual members, also suffer procedural injury from NMFS's April 25, 2025 letter informing commercial fishing permit holders that, effective immediately, "commercial fishing is no longer prohibited" in the Monument Expansion. By skipping over the rulemaking process and the related environmental review processes, Plaintiffs and their members were deprived of the opportunity to provide input to inform and improve NMFS's decision-making process. Plaintiffs' procedural injury "is tied to a substantive 'harm to the environment,'" which "consists of added risk to the environment that takes place when governmental decisionmakers make up their minds without having before them an analysis (*with public comment*) of the likely effects of their decision on the environment." *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 971 (9th Cir. 2003) (citation omitted; emphasis added).

51.    The above-described scientific, professional, educational, recreational, cultural, spiritual, religious, subsistence, aesthetic, and procedural interests of Plaintiffs and their respective members have been, are being, and, unless the relief prayed herein is granted, will continue to be adversely affected and irreparably injured by Defendants' unlawful actions. Plaintiffs bring this action on behalf of themselves and their adversely affected members.

52.     Defendant Donald J. Trump is sued in his official capacity as President of the United States.

53.     Defendant Howard Lutnick is sued in his official capacity as the Secretary of Commerce. In that capacity, Secretary Lutnick is responsible for ensuring that the Department of Commerce and its constituent agencies, including the National Oceanic and Atmospheric Administration ("NOAA"), comply with applicable law, including the Magnuson-Stevens Act, NEPA, the ESA, the APA, and the 2014 Proclamation's directives and requirements for managing the Monument Expansion, including the ban on commercial fishing.

54.     Defendant Laura Grimm is sued in her official capacity as Acting Administrator of NOAA within the U.S. Department of Commerce. The Administrator of NOAA (currently, Ms. Grimm) is responsible for ensuring that NOAA and its constituent offices, including NMFS, comply with applicable law, including the Magnuson-Stevens Act, NEPA, the ESA, the APA, and the 2014 Proclamation's directives and requirements for managing the Monument Expansion, including the ban on commercial fishing.

55.     Defendant Eugenio Piñeiro Soler is sued in his official capacity as Assistant Administrator for NOAA Fisheries (more commonly known as the National Marine Fisheries Service), which is an office of NOAA within the U.S. Department of Commerce. In that capacity, Assistant Administrator Soler is

22

responsible for ensuring that NMFS complies with applicable law, including the

Magnuson-Stevens Act, NEPA, the ESA, the APA, and the 2014 Proclamation's

directives and requirements for managing the Monument Expansion, including the

ban on commercial fishing

57. Defendant Doug Burgum is sued in his official capacity as the

Secretary of the Interior of the United States. In that capacity, Secretary Burgum is

responsible for ensuring that the Department of the Interior and its constituent

agencies, including USFWS, comply with applicable law, including the 2014

Proclamation's directives and requirements for managing the Monument

Expansion, including the ban on commercial fishing.

57. Defendants have the authority, ability, and obligation to remedy the

harms alleged to Plaintiffs' interests.

## LEGAL FRAMEWORK

### The Antiquities Act

58. The U.S. Constitution gives Congress the exclusive "power to dispose

of and make all needful Rules and Regulations respecting the Territory or other

Property belonging to the United States." U.S. Const. art. IV, § 3, cl. 2 (the

Property Clause). Exercising this power, Congress may buy, sell, or withdraw

federal public lands, including submerged lands and associated waters under

federal control, or manage them and prescribe limitations on their use. The

Constitution also gives Congress the exclusive power "[t]o regulate Commerce with foreign Nations, and among the several states." U.S. Const. art. I, § 8, cl. 3 (the Commerce Clause).

59.    In 1906, Congress delegated a part of its Property Clause power to the President when it enacted the Antiquities Act, now codified at 54 U.S.C. § 320301 *et seq*. The Antiquities Act authorizes the President to "declare by public proclamation historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated on land owned or controlled by the Federal Government to be national monuments," *id.* § 320301(a), and to "reserve parcels of land as a part of the national monuments" that comprise the smallest area "compatible with the proper care and management of the objects to be protected," *id.* § 320301(b).

60.    Beginning with Theodore Roosevelt, eighteen Presidents have exercised Congress' express delegation of authority under the Antiquities Act to designate or expand by proclamation 168 national monuments throughout the nation to protect landscapes of extraordinary beauty, as well as irreplaceable and exceptional objects and sites of scientific and historical importance. National monuments have been designated in 36 states as well as in the District of Columbia, the Virgin Islands, American Samoa, Guam, and the Northern Mariana Islands. Depending on the nature and location of the objects to be protected,

24

national monument designations have ranged from just a few acres to millions of acres in size. They include American icons like the Statue of Liberty in New York, Muir Woods in California, Canyon de Chelly in Arizona, and Misty Fjords in Alaska. Many national parks, including Grand Canyon and Zion, began as national monuments. In the 119 years since its enactment, the Antiquities Act has provided lasting and valuable protection to the nation's cultural, natural, and historical heritage.

61.    A President's national monument designation confers enhanced protection for the identified "objects of scientific and historic interest" and for the lands or waters that comprise them or on which they are found. 54 U.S.C. § 320301(a). Once designated as a national monument, those lands and waters must be managed for the purpose of preserving and safeguarding their scientific and historical interest, or the objects of such interest located there.

62.    When designating a national monument, the President may "reserve" federally owned or controlled lands and waters as part of the monument and, as part of that reservation, may impose specific use restrictions that are necessary for the "proper care and management of the objects to be protected." 54 U.S.C. § 320301(b). For example, to ensure that objects of scientific interest are effectively protected, many Presidents have used their Antiquities Act authority to prohibit commercial extractive industries such as commercial fishing—as President Bush

did in the 2009 Proclamation establishing Pacific Remote Islands Marine National Monument, and as President Obama did in the 2014 Proclamation, establishing the Monument Expansion.

63.     In a national monument, lands and waters are managed to protect the identified objects of historical or scientific interest. Conferring monument status, therefore, improves protections for fragile or vulnerable areas or items of historical and scientific interest.

64.     In the Antiquities Act, Congress granted the President limited authority to "*declare* . . . national monuments," 54 U.S.C. § 320301(a) (emphasis added), and to "*reserve*" federal lands and waters to ensure "proper care and management of the objects to be protected," *id.* § 320301(b) (emphasis added). Congress did not authorize the President to abolish national monuments, in whole or in part, once they have been designated, nor did it authorize the President to undo the reservations established by prior Antiquities Act proclamations. Only Congress has those powers.

Magnuson-Stevens Fishery Conservation and Management Act

65.     In response to concerns about overfishing, Congress enacted the Magnuson-Stevens Act to promote the long-term biological and economic sustainability of marine fisheries in U.S. federal waters. *See* 16 U.S.C. § 1801(b). The statute creates eight regional Fishery Management Councils ("Councils") and

requires them to develop "management plans" for all fisheries under their authority that require conservation and management, amendments to such plans, and proposed implementing regulations, which NMFS may approve, partially approve, or reject. *Id.* §§ 1801(b)(4)-(5), 1852(h)(1), 1853, 1854(a)(3) & (b)(1). The fisheries at issue in this case fall under the authority of the Western Pacific Fishery Management Council. *Id.* § 1852(a)(1)(H).

66.    NMFS may approve a fishery management plan, plan amendment, or proposed regulation only if it is consistent with "applicable law," including the ESA and NEPA. *Id.* § 1854(a)(1)(A), (b)(1); *see also id.* §§ 1853(a)(1)(C), 1854(a)(3).

67.    The Magnuson-Stevens Act mandates opportunities for interested members of the public to review every proposed fishery management plan, plan amendment, and implementing regulation and to provide input to inform decision-making.

68.    Councils must "conduct public hearings … so as to allow all interested persons an opportunity to be heard in the development of fishery management plans and amendments to such plans, and with respect to the administration and implementation of the provisions of [the Magnuson-Stevens Act]." *Id.* § 1852(h)(3); *see also id.* § 1852(i)(2)(D) (guaranteeing the right of

interested persons "to present oral or written statements regarding the matters on the [Council's] agenda at meetings").

69.     Upon the transmittal from a Council of a fishery management plan or plan amendment, NMFS must "[i]mmediately publish in the Federal Register a notice stating that the plan or amendment is available and that written information, views, or comments of interested persons on the plan or amendment may be submitted to the Secretary during the 60-day period beginning on the date the notice is published." *Id.* § 1854(a)(1)(B). In its review of the plan or amendment, NMFS must then "take into account the information, views, and comments received from interested persons." *Id.* § 1854(a)(2)(A).

70.     In circumstances where NMFS is authorized to develop its own fishery management plans or plan amendments, *id.* § 1854(c)(1), the Magnuson-Stevens Act guarantees identical opportunities for public input and also mandates that NMFS consider public comments before making its decision whether to adopt the plan or amendment. *Id.* § 1854(c)(2)(A), (4)(B), (5).

71.     Before NMFS adopts a Council's proposed regulation implementing a fishery management plan or plan amendment, NMFS must publish the proposed regulation in the Federal Register "for a public comment period of 15 to 60 days." *Id.* § 1854(b)(1)(A). Where NMFS proposes a regulation to implement a plan or amendment that it prepared, NMFS also must publish notice of the proposed

regulation in the Federal Register and provide a comment period, generally of 60 days. *Id.* § 1854(c)(6).

72.    The Magnuson-Stevens Act places on NMFS the "general responsibility to carry out any fishery management plan or amendment" that it "approved or prepared." *Id.* § 1855(d). NMFS is authorized to promulgate such regulations … as may be necessary to discharge such responsibility or to carry out any other provision of [the statute]. *Id.* When acting under this authority, NMFS must promulgate its regulations "in accordance with section 553 of title 5," *id.*, which requires notice-and-comment rulemaking and guarantees that interested persons will have "an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(c).

73.    The Magnuson-Stevens Act provides for judicial review of regulations promulgated by NMFS under the statute and actions taken under regulations that implement a fishery management plan. 16 U.S.C. § 1855(f). The court is authorized to "set aside any such regulation or action on a ground specified in [5 U.S.C.] section 706(2)(A), (B), (C), or (D)." *Id.* § 1855(f)(2).

Administrative Procedure Act

74.    The APA sets forth the procedures by which federal agencies are accountable to the public and their actions are subject to judicial review.

29

75.    Among other things, the APA defines the procedures that agencies must follow for "rule making," defined as the process of "formulating, amending, or repealing a rule." 5 U.S.C. § 551(5). "Rule," in turn, is defined broadly to include "an agency statement of general or particular applicability and future effect [that is] designed to implement, interpret, or prescribe law or policy." *Id.* § 551(4).

76.    Section 4 of the APA, 5 U.S.C. § 553, prescribes a three-step procedure for what is known as "notice-and-comment rulemaking." First, the agency must issue a "[g]eneral notice of proposed rule making," ordinarily by publication in the Federal Register. *Id.* § 553(b). Second, if "notice [is] required," the agency must "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." *Id.* § 553(c). Third, when the agency promulgates the final rule, it must include in the rule's text "a concise general statement of [its] basis and purpose." *Id.*

77.    Rules issued through the notice-and-comment process are often referred to as "legislative rules" because they have the "force and effect of law." *Chrysler Corp. v. Brown*, 441 U.S. 281, 302-03 (1979) (cleaned up).

78.    The APA recognizes only two exceptions to the requirement for notice-and-comment rulemaking. Unless another statute states otherwise, the notice-and-comment requirement "does not apply" to (1) "interpretative rules, general statements of policy, or rules of agency organization, procedure, or

practice" or (2) "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(A)-(B).

79.    The APA provides for judicial review of "final agency action for which there is no other adequate remedy in a court." *Id.* § 704. "[T]wo conditions must be satisfied" for agency action to be "final." *Bennett v. Spear*, 520 U.S. 154, 177 (1997). "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *Id.* at 177-78 (citation omitted). "[S]econd, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* at 178 (citation omitted).

80.    The APA empowers a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1).

81.    A reviewing court also has the authority to "hold unlawful and set aside agency action, findings, and conclusions found to be," among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" "contrary to constitutional right, power, privilege, or immunity;" "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;" and "without observance of procedure required by law." *Id.* § 706(2)(A)-(D).

National Environmental Policy Act

82.    Congress enacted the NEPA to "encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; [and] to enrich the understanding of the ecological systems and natural resources important to the Nation."  42 U.S.C. § 4321. Congress affirmed "the continuing responsibility of the Federal Government to use all practicable means" to, among other things, "fulfill the responsibilities of each generation as trustee of the environment for succeeding generations" and "preserve important historic, cultural, and natural aspects of our national heritage." *Id.* § 4331(b)(1), (4).

83.    To accomplish Congress's goals, NEPA generally requires every federal agency, including NMFS, to consider fully and disclose in a "detailed statement" the environmental consequences of proposed agency action and an evaluation of a reasonable range of alternate ways to accomplish the agency's goals before the agency makes its decision whether to proceed with that action. *Id.* § 4332(2)(C). "Prior to making any detailed statement," the head of the agency preparing it must "consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved." *Id.* An agency must "ensure the professional

integrity, including scientific integrity, of the discussion and analysis in [its] environmental document," *id.* § 4332(2)(D), and must "make use of reliable data and resources." *Id.* § 4332(2)(E).

84.    "Simply by focusing the agency's attention on the environmental consequences of a proposed project, NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

85.    Except in limited situations, an agency must prepare a NEPA analysis for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). NEPA defines "major Federal action" as "an action that the agency carrying out such action determines is subject to substantial Federal control and responsibility." *Id.* § 4336e(10)(A).

86.    NEPA requires agencies to make a threshold determination whether an "environmental document with respect to a proposed agency action" is required. *Id.* § 4336(a). The only circumstances under which an agency need not prepare a NEPA analysis are when:

(1)    the proposed agency action is not a final agency action within the meaning of [the APA];

(2)    the proposed agency action is excluded pursuant to one of the agency's categorical exclusions, another agency's categorical

exclusions [that the agency has adopted through NEPA's established process], or another provision of law;

(3)    the preparation of such document would clearly and fundamentally conflict with the requirements of another provision of law; or

(4)    the proposed agency action is a nondiscretionary action with respect to which such agency does not have authority to take environmental factors into consideration in determining whether to take the proposed action.

*Id.*; *see also id.* § 4336c.

87.    "The term 'categorical exclusion' means a category of actions that a Federal agency has determined normally does not significantly affect the quality of the human environment." *Id.* § 4336e(1).

88.    In all cases where these limited exclusions do not apply, an agency must prepare either an EIS or an environmental assessment ("EA"). *Id.* § 4336(b).

89.    An agency must prepare an EIS for every "proposed agency action … that has a reasonably foreseeable significant effect on the quality of the human environment." *Id.* § 4336(b)(1). In preparing its EIS, the agency must request "public comment on alternatives or impacts and on relevant information, studies, or analyses with respect to the proposed agency action." *Id.* § 4336a(c).

90.    An agency must prepare an EA for every proposed agency action "that does not have a reasonably foreseeable significant effect on the quality of the human environment, or if the significance of such effect is unknown." *Id.* § 4336(b)(2). The EA is "a concise public document" that "set[s] forth the basis of

[the] agency's finding of no significant impact," which warrants preparation of only an EA, or the agency's "determination that an environmental impact statement is necessary." *Id.*; *see also id.* § 4336e(7).

Endangered Species Act

91.    "[T]he Endangered Species Act of 1973 represented the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 180 (1978) (hereinafter *TVA*). In furtherance of the ESA's goals to conserve species and the ecosystems on which they depend, Congress mandated that "all Federal departments and agencies shall seek to conserve endangered species and threatened species." *Id.* (quoting 16 U.S.C. § 1531(c)(1)) (emphasis omitted). The ESA defines "conserve" as "to use … all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary." 16 U.S.C. § 1532(3). "The plain intent of Congress in enacting [the ESA] was to halt and reverse the trend toward species extinction, whatever the cost." *TVA*, 437 U.S. at 184.

92.    Under the ESA, a species is listed as "endangered" where it is "in danger of extinction throughout all or a significant portion of its range," 16 U.S.C. § 1532(6), and listed as "threatened" where it is "likely to become an endangered

species within the foreseeable future throughout all or a significant portion of its range," *id.* § 1532(20); *see also id.* § 1533.

93.     Section 7(a)(2), 16 U.S.C. § 1536(a)(2), is a critical component of the ESA's statutory and regulatory scheme to conserve endangered and threatened species. Section 7(a)(2) requires each federal agency, in consultation with NMFS or USFWS (depending on the species involved), to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species." *Id.*

94.     Agency "action" broadly includes "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas." 50 C.F.R. § 402.02. Such actions include "the promulgation of regulations" and "the granting of licenses" and "permits," as well as "actions directly or indirectly causing modifications to the land, water, or air." *Id.*

95.     "Jeopardize the continued existence of" is defined as engaging in an action that "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." *Id.*

96.     Section 7(a)(2) requires, among other things, that every federal agency must determine whether its actions "may affect" any endangered or

threatened species. 50 C.F.R. § 402.14(a). If so, and unless it is determined that the agency's proposed actions are "not likely to adversely affect any listed species," the agency must formally consult NMFS or USFWS to ensure it does not violate the jeopardy prohibition. *Id.* § 402.14(b)(1); *see generally id.* § 402.14.

97.     Where the agency taking action and the consulting agency are the same, as in this case with respect to several ESA-listed marine species, the agency must engage in internal or intra-agency consultation. Here, this means that NMFS's Sustainable Fisheries Division, which issued the April 25, 2025 letter, must consult NMFS's Protected Resources Division. NMFS's Sustainable Fisheries Division must also consult USFWS for any species for which USFWS is responsible, such as ESA-listed seabirds.

98.     The ESA section 7(a)(2) consultation evaluates the effects of the proposed action on listed species within the "action area," which is defined as "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." 50 C.F.R. § 402.02; *see also id.* § 402.14(c)(1)(ii)-(iii), (g)(1).

99.     The result of the ESA section 7(a)(2) consultation is the preparation by the consulting agency—NMFS's Protected Resources Division or USFWS—of a "biological opinion" that describes the expected impact on listed species of NMFS's Sustainable Fisheries Division's proposal to open the Monument

Expansion to specific types of commercial fishing under specified conditions. 16 U.S.C. § 1536(b); 50 C.F.R. § 402.14. The Biological Opinion must include, among other things, a "detailed discussion of the effects of the action on listed species" and the consulting agency's opinion on whether the action is "[l]ikely to jeopardize the continued existence of a listed species." 50 C.F.R. § 402.14(h)(1)(iii), (iv)(A).

100.    If the biological opinion concludes that the proposed action will jeopardize the continued existence of threatened or endangered species, it must recommend reasonable and prudent alternatives to the proposed action that would not jeopardize the species.  16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(2).

101.    After the conclusion of formal consultation, an action agency is obliged to reinitiate consultation in several situations, including "where discretionary Federal involvement or control over the action has been retained or is authorized by law and … new information reveals effects of the action that may affect listed species … in a manner or to an extent not previously considered" or "the identified action is subsequently modified in a manner that causes an effect to the listed species … that was not considered in the biological opinion." 50 C.F.R. § 402.16(a)(2), (3).

BACKGROUND FACTS

102.    The Monument Expansion's marine waters are of global ecological importance. The 2014 Proclamation's ban on commercial fishing allowed these waters to be havens for a vast range of marine wildlife.

103.    The Monument Expansion is home to many protected species. Five species of ESA-listed sea turtles use these waters as migratory and feeding grounds, including the critically endangered leatherback turtle. The waters are habitat for twenty-two species of protected marine mammals, seven of which are listed as endangered under the ESA, and also for oceanic whitetip sharks, Indo-West Pacific scalloped hammerhead sharks, and giant manta rays, all of which are listed as threatened under the ESA. Millions of seabirds use the Monument Expansion's waters to feed themselves and their chicks, including species listed under the ESA such as the endangered Hawaiian petrel and threatened Newell's shearwater. Prior to the actions challenged in this litigation, the 2014 Proclamation's ban on commercial fishing ensured the security of these major reservoirs of biodiversity and their populations.

104.    Ecosystems that also benefited from the Monument Expansion's protections include deep water coral reefs, seamounts, guyots, submerged reefs and banks, and abyssal benthic communities. Many of these habitats are understudied, and there are likely others yet to be discovered.

39

Seabirds

105.    Seabirds are an important component of ocean and coastal ecosystems and play an especially important role in the Central Pacific. Seabirds with breeding colonies on Jarvis Island, Wake Island, and Johnston Atoll forage on pelagic fish and then bring vital nutrients back to their island nesting grounds, fertilizing these remote islands with their guano and transforming and promoting diversity in both terrestrial and inshore ecosystems. Coral reefs and their communities then take up these seabird nutrients, causing reef-building corals to grow four times faster in reefs with seabirds than those without, and contributing to larger populations of herbivorous fish. These herbivorous fish populations in turn increase processes that are essential to the long-term health of coral reefs, including grazing of algae from the reef, which makes way for coral growth and reproduction, and bioerosion, which contributes to structural complexity.

106.    Fourteen seabird species nest on Johnston Atoll, including one of the largest red-tailed tropicbirds colonies in the world, with over 12,000 pairs nesting there. Twelve seabird species nest on Wake Island. Jarvis Island has more nesting seabirds than any other island in the U.S. tropical Pacific Islands.



**Figure 3: Young red-tailed tropicbird at Johnston Atoll**
(Credit: USFWS, Pacific Islands)

107.    Seabirds from these nesting colonies forage in the Monument Expansion to feed themselves and their chicks. Many other species of seabirds, including the endangered Hawaiian petrel and the threatened Newell's shearwater, use the pelagic waters of the Monument for foraging.

108.    The seabirds that forage in the Monument Expansion are primarily pelagic feeders that obtain the fish and squid they consume and feed to their young by associating with schools of large predatory fish, such as tuna and billfish. Large schools of predatory fish force schools of small pelagic fish to the surface, where they become easy picking for seabirds. Otherwise, the fish would be too deep or scattered for the seabirds to reach.

109.    The principal current threats at sea for these seabirds are posed by commercial fisheries, through competition and mortality on fishing gear, and

41

pollution. On land, alien invasive predators, habitat degradation, pollution, global climate change, and sea level rise are the main threats. The protections that the Monument Expansion has provided assist in reducing stressors to lessen the cumulative impact of these factors on seabird populations.

110.    It is especially important to have abundant schools of small prey and large predatory fish near breeding colonies because it is much harder for newly hatched and inexperienced birds to find food and successfully feed far from shore and return home safely. The presence of natural densities of large predatory fish such as tuna within the forging radius of seabird colonies enhances the ability of birds to provide adequate food for themselves and their chicks.

111.    A leading cause of population decline for albatross worldwide is being caught and drowned on the baited hooks used by commercial longline fisheries such as those the Trump Proclamation and NMFS's April 25, 2025 letter aim to allow back into monument waters. Data from the NMFS observer program shows that, in 2024 alone, fourteen black-footed albatrosses and Laysan albatrosses were observed hooked in the Hawaiʻi Deep-Set Longline Fishery, which targets tuna and had less than 14% observer coverage; all but one of the hooked albatrosses died.

Sharks



**Figure 4: Threatened oceanic whitetip shark swimming near the surface**
(Credit: John Carlson)

112.    Ocean predators, such as sharks, are some of the most important

species in the marine environment. The Monument Expansion is home to many

species of sharks, including grey reef, silky, hammerhead, and oceanic whitetip

sharks. Both the oceanic whitetip shark and the Indo-West Pacific Distinct

Population Segment ("DPS") of scalloped hammerhead shark are listed as

threatened under the ESA.[2]

113.    Globally, shark populations have declined, and as many as half of all

shark species are now threatened with extinction. Most sharks are unable to

withstand pressures from commercial fishing because they grow slowly, take many

---

[2] The ESA defines "species" to include "any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. § 1532(16).

years to reach sexual maturity, and produce few young. Sharks influence the abundance and diversity of the species below them in the food web, and their removal can have severe ecological consequences. They are a keystone species in decline whose protection is required for a functioning reef system.

114.   In the Pacific, highly migratory shark species that were once categorized as among the most abundant species of large marine animals have declined significantly. Populations of some of these species, such as oceanic whitetip sharks, have dropped to such low levels that fishing vessels are now prohibited from intentionally catching or retaining them. Despite this ban, both species are still incidentally caught and killed on longlines and in purse seines like those the Trump Proclamation and NMFS's April 25, 2025 letter aim to allow back into monument waters.

115.   When NMFS listed the oceanic whitetip shark as a threatened species, it concluded that the species "is extremely susceptible to incidental capture in both longline and purse seine fisheries throughout its range." 83 Fed. Reg. 4,153, 4,162 (Jan. 30, 2018). In 2023, NMFS estimated that the Hawai'i Deep-Set Longline Fishery will hook an average of 1,708 oceanic whitetip sharks each year, killing 557. Earlier this year, NMFS estimated that the American Samoa Longline Fishery will hook up to 3,520 oceanic whitetip sharks every five years, with 1,809 mortalities, and that, in the next five years, the Western and Central Pacific Ocean

("WCPO") Purse Seine Fishery will capture another 2,945 oceanic whitetip sharks, of which 1,894 will die.

116.   NMFS listed the Indo-West Pacific DPS of scalloped hammerhead shark as a threatened species because it faces threats that include "high at-vessel mortality rate associated with incidental capture in fisheries." 79 Fed. Reg. 38,214, 38,237 (July 3, 2014). In its biological opinions, NMFS has estimated that, every five years, the Hawaiʻi Deep-Set Longline Fishery hooks fourteen Indo-West scalloped hammerhead sharks (killing six of them), the American Samoa Longline Fishery hooks 45 (of which it kills eighteen), and the WCPO Purse Seine Fishery kills another ten.

Marine Mammals

117.   The Monument Expansion is used by over 20 species of protected marine mammals, including at least five species listed under the ESA as endangered: blue whale, fin whale, sei whale, sperm whale, and Hawaiian monk seal.

118.   The waters around Johnston Island are teeming with spinner dolphins. Johnston Island and Wake Island are visited by the critically endangered Hawaiian monk seal and may hold potential as monk seal re-colonization areas. There are only about 1,600 Hawaiian monk seals remaining, and starting experimental

45

populations in locations like Johnston Atoll is a potential recovery strategy being considered. Wake Island has its own resident population of spinner dolphins.

119.   A wide variety of tropical and temperate water dolphin species inhabit the Monument Expansion, including pantropical spotted dolphins, spinner dolphins, striped dolphins, rough-toothed dolphins, and bottlenose dolphins. Several rarely sighted species of dolphin inhabit the area, including Fraser's dolphins. This species is primarily oceanic and found in waters deeper than 1,000 meters.

120.   Every year, whales, dolphins, and seals are caught and killed by fishing gear. Most of the deaths occur when marine mammals get snagged on a longline, trapped in a purse seine net, or entangled in derelict fishing gear. The Trump Proclamation and NMFS's April 25, 2025 letter unlawfully open the door to these impacts in the Monument Expansion.

Sea Turtles

121.   Several sea turtle species are found in the Monument as either part of a nesting population or as part of a migratory route between foreign nesting and high-productivity foraging areas. In the Monument Expansion, leatherback, loggerhead, hawksbill, and some DPSs of green turtles are listed as endangered under the ESA, and olive ridley and some DPSs of green turtles are listed as threatened.

46



**Figure 5: Endangered Pacific Leatherback Turtle**
(Credit: Jason Isley, Scubazoo)

122.    The Monument Expansion contains important migration paths for all

sea turtle species. Critically endangered leatherback sea turtles are actively

transiting or foraging in the Monument Expansion twelve months of the year.

Considering the extremely low population of leatherback sea turtles in the Pacific,

and the miniscule percentage that are successfully tagged, the fact that these turtles

have been tracked navigating U.S. waters demonstrates that the monument waters

encompass important migration routes between nesting beaches in Indonesia and

feeding ground off California, and need protection from the longline hooks and

purse seine nets the Trump Proclamation and NMFS's April 25, 2025 letter

unlawfully allow to be reintroduced.

47

123.    Commercial longline and purse seine fisheries, through incidental "bycatch," are among the main causes of anthropogenic mortality of imperiled sea turtles. Although the rates of bycatch may appear to be relatively low, the actual numbers of turtles caught are very significant in relation to the species' populations and have been a main contributor to their precipitous decline in recent years.

124.    NMFS has estimated that, over five years:

- the Hawai'i Deep-Set Longline Fishery hooks or entangles 92 leatherback turtles (killing 10), 77 green sea turtles (killing 74), 43 North Pacific loggerhead turtles (killing 24), and 592 olive ridley sea turtles (killing 545);

- the American Samoa Longline Fishery hooks or entangles 48 leatherback turtles (killing 31), 96 green sea turtles (killing 92), 61 olive ridley sea turtles (killing 44), and 12 hawksbill turtles (killing all 12); and

- the WCPO Purse Seine Fishery captures three leatherback turtles, 38 green sea turtles (killing one or two each year), 25 South Pacific loggerhead turtles (killing one or two each year), 32 olive ridley sea turtles (killing up to one per year), and 23 hawksbill turtles (killing one or two each year).

125.    The Trump Proclamation and NMFS's April 25, 2025 letter allow these commercial fisheries to catch and kill imperiled sea turtles traveling through the Monument Expansion.

Tuna

126.    Tuna are a key component of open ocean ecosystems. They are highly migratory, ranging widely throughout the tropical central and western Pacific. Four species of tuna common to the region are skipjack, yellowfin, bigeye, and albacore.

127.    The benefits of marine protected areas to commercial fish species are well studied. Marine reserves result in higher fish biomass, greater numbers of fish, more species in an ecosystem, and larger fish. The Monument Expansion provides a sanctuary where ecosystems thrive and where these species are safe from overfishing and have the opportunity to mature and reproduce.

128.    Individual tuna from different species can spend their entire life history inside the borders of a marine reserve if the area is large enough. Female fish that are given adequate refuge are allowed to grow older and larger, producing geometrically more eggs and more viable eggs. Fish populations in protected areas also spill over into adjacent waters, increasing the quantity of fish available in surrounding waters.

129.    Healthy populations of large predators such as tuna play a critical role in maintaining ecosystem balance, and rebuilding their numbers leads to healthy

49

and more complex food webs. Healthy ecosystems are better able to cope with, and recover from, unexpected environmental changes including those from climate change.

Commercial Fishing



**Figure 6: Longlines targeting tuna hook and entangle seabirds, marine mammals, sea turtles, and sharks**
(Credit: https://www.bluepeacemaldives.org)

130.    Commercial longline fishing is a primary cause of mortality for seabirds, sea turtles, and sharks in the central Pacific. The Hawai'i Deep-Set Longline Fishery and the American Samoa Longline Fishery target tuna by setting tens of millions of hooks each year. In this industrial fishing method, baited hooks are suspended for hours in the water column from lines sixty or more miles long, and will snag turtles, marine mammals, or seabirds that either are attracted to the

bait or simply try to swim through the curtain of hooks. Many of these animals will drown.



**Figure 7: Purse Seine Fishing Technique**
(Credit: NOAA Fisheries)

131.  Purse seine fishing is another major cause of injury and death to marine life. The WCPO Purse Seine Fishery catches tuna by employing a net up to a mile or more in length and 500 feet deep that encircles the school of tuna. Purse seining is a non-selective fishing method that captures everything that it surrounds. This commercial fishing technique indiscriminately captures and entangles non-target marine species including sharks, marine mammals, manta rays, and sea turtles, often drowning them in the process.

132.  NMFS's biological opinions document the death and injury that the longline and purse seine fisheries inflict on ESA-listed species that are found in the Monument Expansion, including giant manta rays, Indo-West Pacific scalloped

51

hammerhead sharks, oceanic whitetip sharks, green sea turtles, leatherback turtles, loggerhead turtles, olive ridley turtles, hawksbill turtles, sperm whales, sei whales, and fin whales. These fisheries also kill and injure numerous other marine species that are not ESA-listed, including marine mammals protected under the Marine Mammal Protection Act, 16 U.S.C. §§ 1361 *et seq.*, and seabirds protected under the Migratory Bird Treaty Act, 16 U.S.C. §§ 703 *et seq.*

133.   Derelict commercial fishing gear, including long lines and purse seine nets, poses significant threats to nearshore ecosystems within the Monument. Derelict gear can get swept up by currents and wash toward the shoreline, killing turtles, sharks, fish, and other species, and destroying corals along the way.



**Figure 8: Threatened Green Sea Turtle Entangled in Derelict Fishing Gear**
(Credit: NOAA Fisheries/Ari Halperin)

134.   Eliminating the ban on commercial fishing in the Monument

Expansion will draw commercial fishing boats closer to the shorelines of Jarvis

Island, Wake Island, and Johnston Atoll, where the boats' derelict fishing gear is

more likely to injure or kill reef animals, or destroy their coral habitat and food

source.

Seamounts

135.   There are approximately 132 seamounts within the Monument

Expansion. These seamounts contain steep topography, which provides important

habitat for high-density communities of deep-sea corals and sponges. The data

suggest that high-density biological communities are widespread throughout the

monument in places with hard substrate and strong currents.

136.   Most of the world's ocean basins are flat, muddy abyssal plains, but

seamounts are solid, rocky mountains that tower above the plains. Seamounts

protrude into the water column and have dramatic effects on the water currents

around them. These currents both remove fine sediments from seamounts and bring

them an unending supply of nutrients. Therefore, seamounts often attract a

remarkable diversity of fishes and other open ocean animals.

137.   Because food availability above and on seamounts is often higher than

in surrounding waters and seafloors, seamounts are biological hotspots that attract

a diverse fauna. Pelagic predators such as sharks, tunas, billfishes, sea turtles, seabirds and marine mammals often congregate above seamounts.

138.   Less than 0.1% of seamounts globally have been explored, and 15 to 44% of the species on a seamount or seamount group are found nowhere else on earth, which makes seamounts extraordinary biodiversity hotspots. Roughly 5 to 10% of invertebrates found on each survey of a seamount are new to science. Some seamounts are "lost worlds" having enormous pools of undiscovered species.

139.   Seamounts may well harbor the largest number of undiscovered large marine species left on earth. Unique and undiscovered seamount species hold tremendous potential as medicines and for biomedical research.

140.   The remote underwater seamounts provide an important source of food to species due to their associated nutrient-rich upwellings and strong localized currents, which promote growth of massive quantities of plankton. At the base of the food web, these plankton hotspots are prime deep-sea feeding and spawning grounds, providing a pit stop for various pelagic species as they migrate through the vast open ocean.

President Trump's Decision to Strip Core Protections from the Monument Expansion

141.   On April 17, 2025, President Trump issued Proclamation 10918, 90 Fed. Reg. 16,987 (Apr. 22, 2025), invoking authority under the U.S. Constitution

and the Antiquities Act to attempt to delete "[a]ll language under the section entitled 'Management of the Marine National Monument'" in the 2014 Proclamation, stripping from the Monument Expansion the ban on commercial fishing that the 2014 Proclamation established. In its place, President Trump issued a directive that "the Secretary of Commerce shall not prohibit commercial fishing within the boundaries of the Monument" in the waters "[b]etween 50 to 200 nautical miles from the landward boundaries of the Monument," *i.e.,* in the Monument Expansion.

142.   By revoking the ban on commercial fishing, the Trump Proclamation exposes the Monument Expansion to the resumption of activities that are incompatible with the proper care and management of the objects that the 2014 Proclamation sought to protect. The Trump Proclamation revokes the monument's defining protections. If allowed to stand, the Trump Proclamation will effectively abolish the 2014 Proclamation's designation of the Monument Expansion, rendering it a national monument in name only.

143.   The President has no constitutional or statutory authority to revoke or modify national monument designations or protections in this manner.

\\

\\

\\

55

<u>NMFS Precipitously Establishes Rules for Commercial Fishing in the Monument
Expansion, Without Notice-and-Comment Rulemaking</u>

144.   The MSA and APA both require NMFS to solicit, consider, and
incorporate public comment when it establishes or changes fishery management
rules. Even the otherwise invalid Trump Proclamation recognizes this, instructing
the Secretary of Commerce and the Secretary of the Interior to "take appropriate
action pursuant to their respective authorities under the Antiquities Act; the
Magnuson-Stevens Fishery Conservation and Management Act; and such other
authorities as may be available to implement this proclamation, to regulate
fisheries, and to ensure proper care and management of the Monument Expansion."
The Trump Proclamation further directs that "[t]he Secretary of Commerce,
through the Administrator of [NOAA], shall expeditiously publish new proposed
rules in the *Federal Register* to amend or repeal all burdensome regulations that
restrict commercial fishing in the [Monument]."

145.   Contrary to applicable law and the directives in the Trump
Proclamation, NMFS did not engage in notice-and-comment rulemaking—starting
with the publication in the Federal Register of "new proposed rules"—to determine
what types of commercial fishing should now be allowed in the Monument
Expansion and under what conditions "to ensure proper care and management of
the Monument Expansion." Instead, NMFS rushed a decision—with no public
notice or opportunity for input—that the same commercial fishing regulations that

56

previously applied only outside the Monument would now apply in the Monument Expansion.

146.    On April 25, 2025, barely one week after the Trump Proclamation, NMFS's Pacific Islands Regional Office in Honolulu issued a letter addressed to "Dear Permit Holder," which stated:

> This letter is to inform you that commercial fishing is no longer prohibited in certain areas of the Pacific Islands Heritage Marine National Monument (Monument), as described herein. Specifically, commercial fishing may be conducted seaward of 50 nautical miles around Wake Island, Johnston Atoll, and Jarvis Island to the full extent of the 200-mile U.S. exclusive economic zone (EEZ), to the extent authorized under regulations implementing the Fishery Ecosystem Plan for Western Pelagic Fisheries (50 CFR 665 Subpart F), the Fishery Ecosystem Plan for the Pacific Remote Island Areas (50 CFR 665 Subpart E), and International Fishing Regulations set forth in 50 CFR Part 300.

147.    NMFS's letter further instructed permit holders that they could ignore "federal regulations at 50 CFR §§ 665.933(a) and 665.934(a)," which remain on the books.

148.    Plaintiffs are informed and believe, and on the basis thereof allege, that NMFS sent its April 25, 2025 letter to all commercial fishing permit holders in the WCPO Purse Seine Fishery, the American Samoa Longline Fishery, and the Hawai'i Deep-Set Longline Fishery.

149.    NMFS has no statutory authority to issue rules regulating commercial fishing within the Monument Expansion in this manner.

150.    All fishing within the Monument is governed by 50 C.F.R. part 665 subpart H (Pacific Remote Islands Marine National Monument). 50 C.F.R. § 665.930. As NMFS noted in its April 25, 2025 letter, the regulations in that subpart prohibit all commercial fishing in the Monument, including in the Monument Expansion. 50 C.F.R. §§ 665.933(a), 665.934(a); *see also id.* §§ 665.933(d), 665.934(c). The regulations in 50 C.F.R. part 665 subpart H also specify the types of non-commercial fishing that may take place in the Monument and under what conditions. 50 C.F.R. §§ 665.933(b) & (e), 665.933(b) & (d), 665.935.

151.    NMFS adopted the regulations in 50 C.F.R. part 665 subpart H pursuant to standard Magnuson-Stevens Act procedures, which require notice-and-comment rulemaking. To implement the 2009 Proclamation, which banned commercial fishing and authorized the Secretaries of Commerce and of the Interior to "permit noncommercial fishing upon request, at specific locations in accordance with this proclamation," the Western Pacific Fisheries Management Council ("Wespac") initially proposed amendments to the affected fisheries management plans (called "fishery ecosystems plans"), as well as draft implementing regulations. Based on Wespac's recommendations, NMFS then published in the Federal Register a proposed rule "to implement fishery management measures" for the original Monument and invited the public to submit comments. 78 Fed. Reg. 12,015, 12,016 (Feb. 21, 2013). Only after considering and responding to public

comments did NMFS promulgate the regulations. 78 Fed. Reg. 32,996, 32,997-33,002 (June 3, 2013).

152.   To issue fishing rules implementing the 2014 Proclamation, NMFS also engaged in notice-and-comment rulemaking. Initially, Wespac recommended to NMFS that the previously adopted rules for the original Monument banning commercial fishing and regulating non-commercial fishing be applied to the Monument Expansion. NMFS then published in the Federal Register a proposed rule to implement Wespac's recommendation and invited public comment. 80 Fed. Reg. 1,881 (Jan. 14, 2015). After considering and responding to public comment, NMFS promulgated the amended Monument fishing regulations. 80 Fed. Reg. 15,693, 15,694 (Mar. 25, 2015).

153.   Whether NMFS revises fishing rules for the Monument Expansion based on Council recommendations or on its own, the Magnuson-Stevens Act requires notice-and-comment rulemaking, as does the APA. 16 U.S.C. §§ 1854(a)-(c), 1855(d); 5 U.S.C. § 553. Even if NMFS could lawfully ignore the 2014 Proclamation's ban on commercial fishing (and it could not), the agency violated the statutory mandate to engage in notice-and-comment rulemaking when it issued its April 25, 2025 letter.

<u>NMFS Failed to Conduct Any Environmental Review Under NEPA Before Issuing
Its April 25, 2025 Letter</u>

154.    In the past, NMFS has taken steps to comply with NEPA prior to

making decisions about the rules that govern fishing in the Monument.

155.    In 2013, following the Monument's establishment, Wespac prepared

an environmental assessment pursuant to NEPA that described the impact on the

human environment that would result from implementing the fishing requirements

for the original Monument. NMFS relied on that EA and associated FONSI to

satisfy its obligations under NEPA before finalizing its regulations governing

fishing in the original Monument.

156.    In 2015, prior to issuing revised regulations to govern fishing in the

Monument Expansion, NMFS considered relevant new information and

circumstances and determined that none of the new information indicated that the

proposed action would result in a change to impacts previously considered. NMFS

therefore concluded that it did not need to supplement the earlier EA or FONSI and

could rely on them to issue regulations to prohibit commercial fishing and limit

non-commercial fishing in the Monument Expansion.

157.    Plaintiffs are informed and believe, and on the basis thereof allege,

that NMFS ignored NEPA entirely when it issued its April 25, 2025 letter

informing permit holders that "commercial fishing is no longer prohibited" in the

Monument Expansion.

158.   NMFS's April 25, 2025 letter is final agency action within the meaning of NEPA and the APA. Issuance of the letter marked the consummation of NMFS's decision-making process, detailing the new rules that NMFS determined should govern the types of commercial fishing that would be permitted in the Monument Expansion and under what conditions (*i.e.*, the same commercial fishing that was allowed outside the Monument prior to the Trump Proclamation). In addition, the letter purported to confer new rights on holders of commercial fishing permits, allowing them immediately to fish in the Monument Expansion, which previously was off-limits to them, and authorizing them to ignore the regulations that remained on the books banning such commercial fishing. Other legal consequences flowed from NMFS's letter, which made it clear that the public, including Plaintiffs, would have no opportunity to provide input—in notice-and-comment rulemaking under the Magnuson-Stevens Act or with respect to an environmental document prepared under NEPA—before NMFS made up its mind about the commercial fishing that would be authorized in the Monument Expansion.

159.   Opening the Monument Expansion to commercial fishing "has a reasonably foreseeable significant effect on the quality of the human environment," 42 U.S.C. § 4336(b)(1), allowing highly destructive fishing practices that threaten to devastate the pristine ecosystems, imperiled species, and scientific wonders in

the Monument Expansion that the 2014 Proclamation sought to protect. NMFS was, accordingly, obliged to prepare an EIS before making a decision about the commercial fishing that would be authorized in the Monument Expansion.

160.   At a minimum, NMFS was obliged to prepare an EA to determine whether its proposed course of action would have a reasonably foreseeable significant effect on the quality of the human environment. *Id.* § 4336(b)(2).

161.   Plaintiffs are informed and believe, and on the basis thereof allege, that, prior to issuing its April 25, 2025 letter, NMFS failed to conduct any NEPA analysis that took the requisite "hard look" at the impacts of NMFS's chosen course of action and that considered a reasonable range of alternate approaches to for permitting commercial fishing in the Monument Expansion. Plaintiffs are further informed and believe, and on the basis thereof allege, that, prior to issuing its April 25, 2025 letter, NMFS did not make a threshold determination that any categorical exclusion covered its proposed action.

162.   NMFS has no possible justification for its failure to comply with NEPA. No other provision of law precluded NMFS from preparing an EIS or EA. And the Trump Proclamation authorized NMFS to exercise its discretion when regulating commercial fishing in the Monument Expansion to determine what types of commercial fishing would be consistent with the Trump Proclamation's instructions "to ensure proper care and management of the Monument Expansion."

<u>NMFS Failed to Consult Under ESA Section 7 Before Authorizing Fishing in the Monument Expansion</u>

163.   NMFS knows full well that the types of commercial fishing to which it gave the green light in its April 25, 2025 letter—longline fishing and purse seine fishing—adversely affect ESA-listed species, triggering NMFS's obligation to engage in formal consultation under ESA section 7(a)(2). In recent years, NMFS's Sustainable Fisheries Division has consulted NMFS's Protected Resources Division to secure biological opinions for the Hawaiʻi Deep-Set Longline Fishery, the American Samoa Longline Fishery, and the WCPO Purse Seine Fishery. In those biological opinions, NMFS has concluded that these fisheries kill and injure ESA-listed species that are found in the Monument Expansion, including giant manta rays, Indo-West Pacific scalloped hammerhead sharks, oceanic whitetip sharks, green sea turtles, leatherback turtles, loggerhead turtles, olive ridley turtles, hawksbill turtles, sperm whales, sei whales, and fin whales.

164.   Prior to the Trump Proclamation, commercial fishing was banned within the Monument Expansion. Accordingly, the current biological opinions for the Hawaiʻi Deep-Set Longline Fishery, the American Samoa Longline Fishery, and the WCPO Purse Seine Fishery each exclude from their analysis fishing by these fisheries within the Monument Expansion.

165.   NMFS's April 25, 2025 letter purported to open the Monument Expansion to highly destructive fishing techniques that previously had been

banned, modifying the activities of the Hawaiʻi Deep-Set Longline Fishery, the American Samoa Longline Fishery, and the WCPO Purse Seine Fishery in a manner that NMFS knew would cause "an effect to the listed species … that was not considered in the [existing] biological opinion[s]." 50 C.F.R. § 402.16(a)(3). Because the Trump Proclamation did not specify what types of commercial fishing must be allowed in the Monument Expansion or under what circumstances, even if the proclamation were lawful (and it is not), NMFS retained "discretionary … control over the action," triggering its obligation to reinitiate consultation. *Id.* § 402.16(a).

166.   Plaintiffs are informed and believe, and on the basis thereof allege, that, prior to issuing its April 25, 2025 letter, NMFS failed to reinitiate consultation under ESA 7(a)(2) regarding the opening of the Monument Expansion to purse seine fishing and longline fishing, both of which have well-established track records of killing, injuring, and otherwise causing "take" of endangered and threatened marine species that are present in the Monument Expansion.

President Trump's and the Agency Defendants' Actions Harm Plaintiffs' Interests by Eliminating Vital Protections that the 2014 Proclamation Established.

167.   Each of the Plaintiff organizations has individual members who use and enjoy the Monument Expansion for a variety of purposes, including scientific study, wildlife viewing, cultural and spiritual purposes, and aesthetic appreciation.

168.   Plaintiffs' members value the beauty, remoteness, and largely unspoiled nature of the Monument Expansion and the geological, scientific, historical, cultural, biological, and ecological resources found throughout the Monument Expansion. The 2014 Proclamations benefited Plaintiffs' members by withdrawing this area from commercial fishing and other harmful activities.

169.   Plaintiffs' members' use and enjoyment of the entire Monument have been enhanced by the Monument Expansion as specified in the 2014 Proclamation, because the area's priceless and fragile resources received critical protection above and beyond prior management, specifically the prohibition on commercial fishing in pelagic waters from 50 to 200 nautical miles around Jarvis, Wake, and Johnston Atoll.

170.   President Trump's Proclamation directing the revocation of the ban on commercial fishing in the Monument Expansion and NMFS's precipitous implementation of that directive in its April 25, 2025 letter adversely affect Plaintiffs' members' interests by unlawfully removing the prohibition on commercial fishing in the Monument Expansion, allowing activities to commence that will expose irreplaceable resources to heightened risk of harm, interfere with ongoing scientific research, and conflict with the area's unique value to Plaintiffs and their members.

171.    Reopening the Monument Expansion to commercial fishing will likely lead to vessel traffic and noise; result in bycatch and entanglement of marine mammals and other marine wildlife in fishing gear; disturb feeding and foraging seabirds, sea turtles, marine mammals, and other marine wildlife; damage fragile corals; impair the entire Monument's usefulness as a scientific reference and control site; and deleteriously alter the area's ecology and ecosystems, such as by depleting forage fish stocks, removing top predators, and extracting large numbers of fish and other species from the Monument Expansion.

172.    Reopening the Monument Expansion to commercial fishing will also harm endangered, threatened, and vulnerable species like whales, sea turtles, and seabirds, by disrupting the areas on which they depend for feeding and migration, as well as injuring and killing animals directly. These impacts could adversely affect wildlife populations as a whole, reducing their availability to be viewed, studied, and enjoyed in the wild.

173.    Reopening the Monument Expansion to commercial fishing will interfere with scientific investigations by continuing to harm and potentially extirpate the numerous species there that have yet to be identified and investigated.

174.    Reopening the area to commercial fishing will make it impossible to use the Monument as control areas for comparative studies of the effects of human disturbances on ocean ecosystems. Scientists, including Plaintiffs' members, are

using the Monument as unique control areas that would help them study the impacts of commercial fishing on similar areas of the Pacific Ocean. They also are using the Monument to analyze the ecological and other benefits associated with landscape-scale closed marine areas. This will no longer be possible if the commercial fishing prohibition is revoked.

175.   President Trump's and the Agency Defendants' actions render one of the world's most pristine, unique areas vulnerable to immediate harm, and thus injure the scientific, professional, educational, recreational, cultural, spiritual, religious, subsistence, and aesthetic values that Plaintiffs' members derive from the Monument.

Agency Defendants have failed to carry out their duties under the 2014 Proclamation

176.   NMFS has already flouted the 2014 Proclamation's command to ban commercial fishing in the Monument Expansion, issuing its April 25, 2025 letter giving the green light for commercial fishing to resume immediately. Defendants Lutnick, Grimm, and Piñeiro Soler have already violated their duty to ensure NMFS's compliance with the 2014 Proclamation.

177.   Defendant Burgum has done nothing to stop them, despite the Department of the Interior's authority over refuges, which include the entire Monument Expansion.

178.   Plaintiffs are informed and believe, and on the basis thereof allege, that, due to President Trump's action, Agency Defendants have decided that they will no longer implement the 2014 Proclamation's requirement that they prohibit commercial fishing within the Monument Expansion.

179.   President Trump, by purporting to remove restrictions put in place by the 2014 Proclamation, and Agency Defendants, by refusing to carry out their duties under the 2014 Proclamation, have deprived Plaintiffs of the benefits of the protections in 2014 Proclamation.

180.   President Trump's and the Agency's Defendants' actions adversely affect and irreparably injure Plaintiffs' and their members' interests, and that injury will continue unless the Court grants the relief Plaintiffs seek.

181.   Plaintiffs' injuries would be redressed by the relief sought here.

182.   Plaintiffs have no adequate remedy at law.

FIRST CLAIM FOR RELIEF
(Antiquities Act against Defendant Trump)

183.   Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint.

184.   Judicial review is available to ensure that presidential actions are consistent with constitutional principles and that the President has not exceeded his statutory authority.

185.   The President has the authority to regulate federal property or foreign and interstate commerce only to the limited extent that Congress has delegated that authority to the President.

186.   In his April 17, 2025, Proclamation, President Trump exceeded his authority under the Antiquities Act, 54 U.S.C. §§ 320301 *et seq*. Under the Act, Congress authorized the President to "designate" national monuments and to "reserve" lands and waters for the protection of objects of historic or scientific interest, but did not authorize the President to undo such designations or to abolish such reservations, in whole or in part.

187.   As a result, President Trump's Proclamation exceeded the scope of his authority, is *ultra vires*, and is unlawful.

SECOND CLAIM FOR RELIEF
(U.S. Constitution, art. II, and Separation-of-Powers Doctrine,
against Defendant Trump)

188.   Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint.

189.   Judicial review is available to ensure that presidential actions are consistent with constitutional principles and that the President has not unlawfully intruded on Congress's exclusive power over federal property and foreign and interstate commerce under the Constitution. U.S. Const. art. IV, § 3, cl. 2; *id.* art. I, § 8, cl. 3.

190.   The President has the authority to regulate federal property and foreign and interstate commerce only to the limited extent that Congress has delegated that authority to the President.

191.   Congress has not delegated authority to the President to revoke protections for the proper care and management of monument objects or to abolish a national monument reservation, in whole or in part. In the Antiquities Act, Congress retained that authority for itself.

192.   In issuing his Proclamation, President Trump exceeded his authority under Article II of the U.S. Constitution and intruded on Congress's exclusive power to regulate federal property and foreign and interstate commerce under the Property and Commerce Clauses, in violation of the doctrine of separation of powers.

## THIRD CLAIM FOR RELIEF
(U.S. Const. art. II, § 3 and Take Care Clause,
against Defendant Trump)

193.   Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint.

194.   The United States Constitution requires the President to "take Care that the Laws be faithfully executed." U.S. Const. art II, § 3.

195.   The 2014 Proclamation, which was a lawful exercise of congressional authority delegated to President Obama under the Antiquities Act, is a "law"

70

within the meaning of the "take Care" clause. The Constitution requires President

Trump to faithfully execute that law.

196.    President Trump must also "take Care" to faithfully execute the

Antiquities Act, including its narrow delegation of authority to Presidents to

declare national monuments and reserve federal lands, but not abolish them or

revoke reservations.

197.    President Trump has violated the "Take Care" clause of the U.S.

Constitution by attempting to eliminate from the Monument Expansion the core

reservation—a ban on commercial fishing—that the 2014 Proclamation lawfully

established under the Antiquities Act to provide for the proper care and

management of the scientific and historic objects in the Monument Expansion.

### FOURTH CLAIM FOR RELIEF
(Administrative Procedure Act against the Agency Defendants)

198.    Plaintiffs re-allege and incorporate by reference all the allegations set

forth in this Complaint.

199.    The APA confers a right of action on any person adversely affected by

a final agency action or a failure to act and waives the federal government's

sovereign immunity. 5 U.S.C. § 702.

200.    Because President Trump had no lawful authority to revoke

protections from the Monument Expansion, the Secretaries of Commerce and the

Interior and their subordinate officers remain subject to the 2014 Proclamation's direction to prohibit commercial fishing in the Monument Expansion.

201.    Any action by the Agency Defendants contrary to 2014 Proclamation is arbitrary and capricious and not in accordance with law.

202.    As a result of President Trump's Proclamation, Defendants Lutnick, Grimm, and Piñeiro Soler have already violated their duty to ensure NMFS's compliance with the 2014 Proclamation, and Defendant Burgum has done nothing to stop them, despite the Department of the Interior's authority over refuges, which include the entire Monument Expansion. Plaintiffs are informed and believe, and on the basis thereof allege, that the Agency Defendants have no intention of carrying out their duties to prohibit commercial fishing under the 2014 Proclamation as long as President Trump's Proclamation remains in effect.

## FIFTH CLAIM FOR RELIEF
(Magnuson-Stevens Act and Administrative Procedure Act – Failure to Revise Fishing Rules Through Notice-and-Comment Rulemaking – against Defendants Lutnick, Grimm, and Piñeiro Soler)

203.    Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint.

204.    Defendants Lutnick, Grimm, and Piñeiro Soler are responsible for ensuring that NMFS complies with the Magnuson-Stevens Act and the APA.

205.   All fishing within the Monument, including in the Monument Expansion, is governed by 50 C.F.R. part 665 subpart H (Pacific Remote Islands Marine National Monument). 50 C.F.R. § 665.930.

206.   To implement the Trump Proclamation, NMFS issued its April 25, 2025 letter, which purports to revise the rules governing fishing in the Monument Expansion to specify which commercial fishing techniques are now allowed and under what conditions.

207.   Whether NMFS revises fishing rules for the Monument Expansion based on Council recommendations or on its own, the Magnuson-Stevens Act and APA mandate notice-and-comment rulemaking before NMFS may adopt any fishery management plan, plan amendment, or proposed regulation. 16 U.S.C. §§ 1854(a)-(c), 1855(d); 5 U.S.C. § 553. NMFS failed to comply with these statutory requirements before issuing its April 25, 2025 letter.

208.   By issuing the April 25, 2025 letter rather than engaging in notice-and-comment rulemaking to revise the rules governing fishing in the Monument Expansion, NMFS violated the Magnuson-Stevens Act and the Administrative Procedure Act.

209.   NMFS's actions are arbitrary, capricious, an abuse of discretion, not in accordance with law, and/or without observance of procedure required by law within the meaning of the APA, 5 U.S.C. § 706(2).

## SIXTH CLAIM FOR RELIEF
(Administrative Procedure Act – Failure to Revise
Fishing Rules Through Notice-and-Comment Rulemaking –
against Defendants Lutnick, Grimm, and Piñeiro Soler)

210.   Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint.

211.   Defendants Lutnick, Grimm, and Piñeiro Soler are responsible for ensuring that NMFS complies with the APA.

212.   Even if NMFS's April 25, 2025 letter is not deemed a fishery management plan, plan amendment, or proposed regulation adopted pursuant to the Magnuson-Stevens Act, section 4 of the APA, 5 U.S.C. § 553, required NMFS to engage in notice-and-comment rulemaking before revising the rules for fishing within the Monument Expansion. The rules that NMFS articulated in its letter are "legislative rules" because NMFS intended them to have the "force and effect of law." *Chrysler Corp.*, 441 U.S. at 302-03 (cleaned up). NMFS failed to comply with this statutory requirement before issuing its April 25, 2025 letter.

213.   By issuing the April 25, 2025 letter rather than engaging in notice-and-comment rulemaking to revise the rules governing fishing in the Monument Expansion, NMFS violated the Administrative Procedure Act.

214.   NMFS's actions are arbitrary, capricious, an abuse of discretion, not in accordance with law, and/or without observance of procedure required by law within the meaning of the APA, 5 U.S.C. § 706(2).

SEVENTH CLAIM FOR RELIEF

(National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.*,
and Administrative Procedure Act, 5 U.S.C. § 701 *et seq.,*
against Defendants Lutnick, Grimm, and Piñeiro Soler)

215.   Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint.

216.   The Department of Commerce, NOAA, and NMFS are "agencies of the Federal Government" and, therefore, must comply with NEPA. 42 U.S.C. § 4332(2).

217.   Defendants Lutnick, Grimm, and Piñeiro Soler are responsible for ensuring that NMFS complies with NEPA.

218.   NMFS's April 25, 2025 letter constitutes "major Federal action" for purposes of NEPA because it is an action "subject to substantial Federal control and responsibility." *Id.* § 4336e(10)(A).

219.   NMFS's April 25, 2025 letter constitutes "final agency action" within the meaning of NEPA and the APA because issuance of the letter marked the consummation of NMFS's decision-making process, the letter purported to confer new rights on holders of commercial fishing permits, allowing them immediately to fish in the Monument Expansion, and other legal consequences flowed from NMFS's letter, which made it clear that the public, including Plaintiffs, would have no opportunity to provide input—in notice-and-comment rulemaking under the Magnuson-Stevens Act or with respect to an environmental document prepared

under NEPA—before NMFS made up its mind about the commercial fishing that would be authorized in the Monument Expansion.

220.   NMFS's April 25, 2025 letter authorized highly destructive fishing practices that threaten to devastate the pristine ecosystems, imperiled species, and scientific wonders in the Monument Expansion that the 2014 Proclamation sought to protect. NMFS's action "has a reasonably foreseeable significant effect on the quality of the human environment." 42 U.S.C. § 4336(b)(1).

221.   Plaintiffs are informed and believe, and on the basis thereof allege, that, prior to issuing its April 25, 2025 letter, NMFS failed to conduct any NEPA analysis that took the requisite "hard look" at the impacts of NMFS's chosen course of action and that considered a reasonable range of alternate approaches to for permitting commercial fishing in the Monument Expansion. Plaintiffs are further informed and believe, and on the basis thereof allege, that, prior to issuing its April 25, 2025 letter, NMFS did not make a threshold determination that any categorical exclusion covered its proposed action.

222.   NMFS's decision to issue its April 25, 2025 letter without first preparing a legally adequate EA or EIS violates NEPA.

223.   NMFS's decision to issue its April 25, 2025 letter without first preparing a legally adequate EA or EIS is arbitrary, capricious, an abuse of

discretion, not in accordance with law, and/or without observance of procedure required by law within the meaning of the APA, 5 U.S.C. § 706(2).

EIGHTH CLAIM FOR RELIEF
(Magnuson-Stevens Act and Administrative Procedure Act – Failure to Ensure Consistency With Applicable Law – against Defendants Lutnick, Grimm, and Piñeiro Soler)

224.   Plaintiffs re-allege and incorporate by reference all the allegations set forth in this Complaint.

225.   Defendants Lutnick, Grimm, and Piñeiro Soler are responsible for ensuring that NMFS complies with the Magnuson-Stevens Act and the APA.

226.   The Magnuson-Stevens Act authorizes NMFS to approve a fishery management plan, plan amendment, or proposed regulation only if it is consistent with "applicable law." 16 U.S.C. § 1854(a)(1)(A), (b)(1); *see also id.* §§ 1853(a)(1)(C), 1854(a)(3).

227.   For the reasons set forth above, and in the Seventh Claim for Relief, the April 25, 2025 letter is not consistent with NEPA, which is an applicable law.

228.   The April 25, 2025 letter also is not consistent with the ESA, another applicable law.

229.   Section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), requires NMFS's Sustainable Fisheries Division, in consultation with the NMFS's Protected Resources Division and the U.S. Fish and Wildlife Service, to ensure that any

action it authorizes, funds, or carries out is not likely to jeopardize the continued existence of any threatened or endangered species.

230.   Because commercial fishing was banned within the Monument Expansion prior to the Trump Proclamation, the current biological opinions for the Hawaiʻi Deep-Set Longline Fishery, the American Samoa Longline Fishery, and the WCPO Purse Seine Fishery each exclude from their analysis fishing by these fisheries within the Monument Expansion.

231.   NMFS's issuance of the April 25, 2025 letter, which purports to open the Monument Expansion to highly destructive fishing activities that have a track record of killing and injuring the ESA-listed species found in the Monument Expansion, constitutes a federal agency action that "may affect" species protected under the ESA.  50 C.F.R. §§ 402.02, 402.14(a). By opening the Monument Expansion to highly destructive fishing techniques that previously had been banned, NMFS's letter modified the activities of the Hawaiʻi Deep-Set Longline Fishery, the American Samoa Longline Fishery, and the WCPO Purse Seine Fishery in a manner that NMFS knew would cause "an effect to the listed species … that was not considered in the [existing] biological opinion[s]." *Id.* § 402.16(a)(3).

232.   Because the Trump Proclamation did not specify what types of commercial fishing must be allowed in the Monument Expansion or under what

circumstances, even if the proclamation were lawful (and it is not), NMFS retained "discretionary … control over the action," triggering its obligation to reinitiate consultation. *Id.* § 402.16(a).

233.    Under ESA Section 7(a)(2), NMFS's Sustainable Fisheries Division was required—but failed—to consult NMFS's Protected Resources Division on the effects of the commercial fishing proposed in its April 25, 2025 letter prior to issuing that letter. The April 25, 2025 letter, therefore, is not consistent with the ESA.[3]

234.    NMFS's April 25, 2025 letter is not consistent with the 2014 Proclamation, which is applicable law.

235.    In issuing the April 25, 2025 letter, NMFS also failed to comply with the directives in the otherwise unlawful Trump Proclamation, which instructed NMFS to engage in notice-and-comment rulemaking—starting with the publication in the Federal Register of "new proposed rules"—to determine what types of commercial fishing should now be allowed in the Monument Expansion and under what conditions "to ensure proper care and management of the Monument Expansion." Assuming for the sake of argument that the Trump Proclamation is lawful, NMFS's April 25, 2025 letter is not consistent with it.

---

[3] Plaintiffs intend to bring a separate claim pursuant to the ESA's citizen suit provision after giving the requisite notice of intent to sue. *See* 16 U.S.C. § 1540(g).

236.   NMFS's decision to issue its April 25, 2025 letter in spite of the letter's inconsistencies with applicable law violates the Magnuson-Stevens Act and is arbitrary, capricious, an abuse of discretion, not in accordance with law, and/or without observance of procedure required by law within the meaning of the APA, 5 U.S.C. § 706(2).

## PRAYER FOR RELIEF

WHEREFORE plaintiffs request that the Court:

1.     Declare that Defendant President Trump's Proclamation is *ultra vires* and exceeds his authority under the Antiquities Act;

2.     Declare that Defendant President Trump's Proclamation exceeds the scope of his authority under Article II of the U.S. Constitution and violates the separation of powers doctrine and the "Take Care" clause;

3.     Declare that Defendants Lutnick, Grimm, and Piñeiro Soler have violated the Magnuson-Stevens Act and the APA as described above because NMFS failed to engage in notice-and-comment rulemaking before issuing its April 25, 2025 letter that purports to revise the rules for fishing within the Monument Expansion and otherwise failed to comply with all applicable law, including NEPA, the ESA, the 2014 Proclamation, and (assuming for the sake of argument that it is lawful) the Trump Proclamation;

4.      Declare that Defendants Lutnick, Grimm, and Piñeiro Soler have violated NEPA and the APA as described above by failing to prepare any environmental document to accompany NMFS's April 25, 2025 letter that (1) takes the requisite "hard look" at the environmental impacts of the proposed commercial fishing activities in the Monument Expansion, (2) considers a reasonable range of alternatives, and (3) provides opportunities for public comment on NMFS's proposal operations and reasonable alternatives;

5.      Hold unlawful and set aside NMFS's April 25, 2025 letter;

6.      Issue injunctive relief barring implementation of President Trump's unlawful Proclamation;

7.      Issue injunctive relief against Defendants Lutnick, Grimm, Piñeiro Soler, and Burgum, directing them to carry out their mandatory duties imposed in the 2014 Proclamation, including implementing the ban on commercial fishing in the Monument Expansion, and prohibiting them from authorizing the implementation of President Trump's unlawful Proclamation;

8.      Award Plaintiff fees and costs pursuant to 28 U.S.C. § 2412; and

9.      Grant such other relief as the Court deems just and proper.

DATED:      Honolulu, Hawaiʻi, May 22, 2025.

/s/ David L. Henkin
DAVID L. HENKIN
KYLIE W. WAGER CRUZ
ELENA L. BRYANT
EARTHJUSTICE

Attorneys for Plaintiffs
Kāpaʻa, Conservation Council for Hawaiʻi,
and Center for Biological Diversity