IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| KĀPA'A, *et al.*, | Civil No. 25-00209 MWJS-WRP |
| Plaintiffs, | ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT RE: FIFTH AND SIXTH CLAIMS FOR RELIEF |
| vs. | |
| DONALD J. TRUMP, *et al.*, | |
| Defendants. | |

## INTRODUCTION

In the heart of the Pacific Ocean to the south and west of the main Hawaiian Islands lay the pristine waters of Wake, Jarvis, Baker, and Howland Islands, Johnston and Palmyra Atolls, and Kingman Reef.  The waters are home to a unique ecosystem of coral reefs and diverse marine species.  To protect the historic and scientific interests in these waters, President George W. Bush designated the area in 2009 as a national monument, which is now known as the Pacific Islands Heritage Marine National Monument.  President Barack H. Obama expanded the Monument in 2014 to embrace a substantially larger share of the waters surrounding Wake and Jarvis Islands and Johnston Atoll.  And in the years since, the National Marine Fisheries Service, or "NMFS"—an agency within the Department of Commerce—has promulgated

regulations banning commercial fishing within the boundaries of the 2009 Monument and 2014 Monument Expansion using formal notice and comment procedures.

In an April 2025 Proclamation, President Donald J. Trump found that "appropriately managed commercial fishing" would not endanger the Monument Expansion. Based on that finding, President Trump declared that the Secretary of Commerce "shall not prohibit commercial fishing" for U.S. flagged vessels in the Monument Expansion, and that the Secretary instead shall "take appropriate action" to "implement" the Proclamation and "expeditiously publish new proposed rules in the *Federal Register* to amend or repeal all burdensome regulations that restrict commercial fishing" in that area.

To date, the Secretary has not proposed any such rules. But just over a week after President Trump's Proclamation, NMFS issued a letter informing permit holders that commercial fishing is now fair game in the Monument Expansion. The letter did not merely suggest that NMFS would decline to enforce its existing regulations banning commercial fishing there. Nor did it simply suggest that commercial fishing would become lawful once NMFS had used notice and comment procedures to repeal existing regulations. Instead, the letter took the position that those regulations no longer exist: it asserted that President Trump's Proclamation—which had only called for proposed rules to repeal existing regulations—had itself already done the work of rendering the existing regulations "no longer effective."

2

Because NMFS took the position that it had no obligation to engage in notice and comment procedures to repeal the existing regulations prohibiting commercial fishing, Plaintiffs—and the public more generally—were afforded no opportunity to comment on whether specific types of commercial fishing, such as longline and purse seine fishing (which Plaintiffs contend are highly destructive), are consistent with the "appropriately managed commercial fishing" that President Trump had called for in his Proclamation. And in the wake of NMFS's letter, commercial fishing operations—including those using longline and purse seine techniques—have begun in the Monument Expansion's waters.

Interested cultural and environmental organizations responded by filing this suit, and they have now moved for summary judgment on two of their claims, which are based on the Magnuson-Stevens Fishery Conservation and Management Act (Magnuson Act) and the Administrative Procedure Act (APA). Plaintiffs contend that NMFS violated these statutes by failing to engage in notice-and-comment rulemaking before issuing its letter. In its opposition, the government argues that Plaintiffs lack Article III standing and that the court lacks jurisdiction to consider their claims. But the government has chosen not to defend the letter on the merits.

The court concludes that Plaintiffs have Article III standing and that it has jurisdiction under the APA. For these reasons, and because the government has

forfeited any argument on the merits of Plaintiffs' notice-and-comment claims,

Plaintiffs' motion for summary judgment is GRANTED.

## BACKGROUND

### A.    Factual Background

#### 1.    The Monument and Expansion

The Antiquities Act of 1906 authorizes the President to "declare by public

proclamation historic landmarks, historic and prehistoric structures, and other objects

of historic or scientific interest that are situated on land owned or controlled by the

Federal Government to be national monuments."  54 U.S.C. § 320301(a).  It further

authorizes the President to "reserve parcels of land as a part of the national

monuments."  *Id.* § 320301(b).

a.   In 2009, President Bush invoked his authority under the Antiquities Act to

issue a proclamation establishing what was at the time called the Pacific Remote Islands

Marine National Monument.  Proclamation No. 8336, 74 Fed. Reg. 1565 (Jan. 6, 2009).

The proclamation set aside the waters and submerged and emergent lands of Wake,

Jarvis, Baker, and Howland Islands, Johnston and Palmyra Atolls, and Kingman Reef to

a boundary line approximately fifty nautical miles from their mean low water lines.  *Id.*

at 1565-67.  In establishing the Monument, the proclamation sought to protect the

significant historic and scientific interests in the area, which is home to some of the most

pristine coral reefs in the world and diverse marine species, including various

4

threatened and endangered species.  *Id.*  In furtherance of this aim, President Bush's

proclamation directed the Secretary of Commerce to "prohibit commercial fishing

within the boundaries of the monument."  *Id.* at 1568.

Shortly thereafter, the Regional Administrator for NMFS's Pacific Islands

Regional Office issued a letter to commercial fishing permit holders advising them of

President Bush's proclamation.  ECF No. 21-4, at PageID.1362 (AR at 000463).  The

Regional Administrator is a high-ranking NMFS official responsible for, among other

things, approving, disapproving, and implementing fisheries management plans.  ECF

No. 30-2, at PageID.3894.  In the letter, the Regional Administrator took the position that

"the commercial fishing prohibitions and other terms set out in the Presidential

Proclamation[] became immediately effective upon issuance of the Proclamation[]," and

that as a consequence, "all commercial fishing within the waters of the . . . marine

National Monument[] . . . is now prohibited."  ECF No. 21-4, at PageID.1362 (AR at

000463).  In taking this position, the Regional Administrator was not asserting that a

Presidential proclamation had the authority to eliminate regulations passed through

notice-and-comment rulemaking;[1] indeed, at that time, there were no formal regulations

allowing commercial fishing in the newly-created Monument.

---

[1]    The detailed requirements of notice and comment procedures are
described *infra* at page 45.  For now, it suffices to say that these procedures ensure
"interested persons an opportunity to participate in [an agency's] rule making through
submission of written data, views, or arguments."  5 U.S.C. § 553(c).

Following President Bush's proclamation, NMFS engaged in notice and comment procedures and ultimately published a final rule in 2013 establishing regulations that "codif[ied] certain provisions of the Proclamation," including its prohibition on commercial fishing.  50 C.F.R. § 665.930 (2013); *see also id.* § 665.933(a) (2013) (prohibiting "[c]ommercial fishing in the Monument"); *id.* § 665.934(a) (2013) (same).  The regulations are found at 50 C.F.R. Part 665, subpart H.

b.  In 2014, President Obama issued a proclamation under the Antiquities Act to significantly expand the Monument boundary lines.  Proclamation No. 9173, 79 Fed. Reg. 58645 (Sept. 25, 2014).  The Monument Expansion area encompassed the waters and submerged lands of Jarvis and Wake Islands and Johnston Atoll from the prior Monument boundary lines to the seaward limit of the U.S. Exclusive Economic Zone of each island, up to 200 nautical miles from the landward boundaries.  *Id.* at 58647, 58651-53.

President Obama's proclamation found that, much like the originally-designated Monument, the Expansion area provided an "important ecosystem for scientific study and research."  *Id.* at 58646.  A significant feature of the area is undersea mountains, or "seamounts," which are home to ancient deepwater corals and "pools of undiscovered species."  *Id.* at 58645.

Once again, the proclamation directed the Secretary to "prohibit commercial fishing within the boundaries of the Monument Expansion."  *Id.* at 58647.  And NMFS

followed this directive by engaging in notice and comment procedures and eventually

publishing a final rule in 2015 that updated the regulations to codify President Obama's

new ban on commercial fishing in the Expansion area.  80 Fed. Reg. 15693 (Mar. 25,

2015) (codified at 50 C.F.R. pt. 665, subpt. H).

### 2.    President Trump's Proclamation and NMFS's Letter

On April 17, 2025, President Trump issued his own proclamation, titled

"Unleashing American Commercial Fishing in the Pacific."  Proclamation No. 10918, 90

Fed. Reg. 16987 (Apr. 17, 2025) (hereinafter the "Proclamation").  The Proclamation

found that "appropriately managed commercial fishing would not put the objects of

scientific and historic interest that the [Monument] protects at risk."  *Id.* at 16987.

Accordingly, it revised President Obama's prior proclamation to state that in the

Monument Expansion area, "[b]etween 50 and 200 nautical miles from the landward

boundaries of the Monument, the Secretary of Commerce shall not prohibit commercial

fishing."  *Id.* at 16988.  But commercial fishing was not banned in the Monument

Expansion merely through President Obama's proclamation; as noted, formal

regulations to that same effect had been promulgated through notice and comment

procedures.  And so President Trump's Proclamation directed the Secretary to

"expeditiously publish new proposed rules in the Federal Register to amend or repeal

all burdensome regulations that restrict commercial fishing" in the Monument

Expansion.  *Id.* at 16989.  Still, given that the Monument Expansion remains a protected

area under the Antiquities Act, the Proclamation also instructed the Secretary to "take

appropriate action . . . to ensure proper care and management of the Monument

Expansion." *Id.* at 16988.

Following President Trump's Proclamation, at least sixteen vessel owners and

operators inquired about the implications for commercial fishing in the Monument

Expansion. ECF No. 30, at PageID.3879 (Pls.' Further Concise Statement of Facts (CSF)

¶ 4). NMFS officials advised those who inquired in the week after the Proclamation

was issued that an "official" letter was forthcoming. ECF No. 28-2, at PageID.3834.

On April 25, 2025, the Regional Administrator for NMFS's Pacific Islands

Regional Office sent a letter to all permit holders in the Hawaiʻi and American Samoa

longline fisheries and U.S. purse seine[2] vessel owners operating in the Western and

Central Pacific Ocean. ECF No. 30, at PageID.3875 (Pls.' Further CSF ¶ 1). The letter

informed the permit holders "that commercial fishing is no longer prohibited in certain

areas of the" Monument. ECF No. 14-22, at PageID.795. It recited that President Trump

issued the Proclamation, which "amended [President Obama's prior proclamation] to

remove the commercial fishing prohibition in the areas 50-200 nautical miles created by

[the prior proclamation], and became effective upon issuance on April 17, 2025." *Id.*

But the letter also took the position that President Trump's Proclamation did more than

---

[2]        Longline fishing "deploys baited hooks along mainlines of up to sixty nautical
miles in length." ECF No. 13-1, at PageID.132. Purse seine fishing "uses massive nets
nearly a mile in length and 500 feet in depth to scoop up metric tons of catch." *Id.*

merely revise President Obama's earlier proclamation; in NMFS's view, it also effectively eliminated the formal regulations banning commercial fishing in the Monument Expansion, which had been passed through notice and comment procedures. As the letter put it, "[a]s a result" of President Trump's Proclamation, "federal regulations at 50 CFR §§ 665.933(a) and 665.934(a) implementing [President Obama's proclamation's] commercial fishing prohibition are no longer effective." *Id.* The letter went on to remind permit holders that commercial fishing "remains prohibited" in the original Monument area, and it provided coordinates and a map depicting the still-prohibited fishing areas. *Id.* Finally, the letter noted that NMFS "plan[s] to expeditiously initiate rulemaking to bring fishing regulations into compliance" with President Trump's Proclamation. *Id.*

In addition to sending the letter to permit holders, NMFS posted the contents of the letter on its official government website. ECF No. 30-3, at PageID.3896-97. Meanwhile, no regulations have yet been formally proposed.

### B.    Procedural Background

In May 2025, three cultural and environmental organizations filed suit, challenging the legality of President Trump's Proclamation and NMFS's letter. ECF No. 1. Plaintiffs include Kāpaʻa, which is a hui, or unincorporated association, of Native Hawaiian cultural practitioners, *id.* at PageID.11 (¶ 25); the Conservation Council for Hawaiʻi, a non-profit citizens' organization based in Hawaiʻi, *id.* at PageID.16 (¶ 35);

and the Center for Biological Diversity, a non-profit environmental organization, *id.* at

PageID.19 (¶ 43).  In the lawsuit, Plaintiffs assert that the Proclamation exceeded

President Trump's authority under the Antiquities Act and Article II of the U.S.

Constitution and violated the Take Care Clause of Article II, Section 3 of the

Constitution.  *Id.* at PageID.69-72 (¶¶ 183-97).  Plaintiffs further bring claims against

agency officials under the National Environmental Policy Act (NEPA), the Magnuson

Act, and the APA.  *Id.* at PageID.72-81 (¶¶ 198-236).

At this stage, Plaintiffs have filed a motion for summary judgment on just two of

their claims, counts five and six, which allege that agency officials violated the

Magnuson Act and the APA when NMFS issued the April 25, 2025, letter purporting to

revise the commercial fishing rules without engaging in notice-and-comment

rulemaking.  ECF No. 13.  The government opposes the motion solely on the grounds

that the court does not have subject matter jurisdiction over Plaintiffs' claims.  ECF No.

23.  The court held a hearing on the motion on August 5, 2025.  ECF No. 35.  Both

Plaintiffs and Defendants were ably represented by their respective counsel.

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted where a movant shows there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of

law.  Fed. R. Civ. P. 56(a).  Summary judgment lies only where no "reasonable jury

could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Summary judgment "is a particularly appropriate tool for resolving claims challenging agency action." *Ctr. for Biological Diversity v. Haaland*, 562 F. Supp. 3d 68, 76 (D. Ariz. 2021) (cleaned up). That is because in administrative agency cases, "the district court's role is not to resolve facts, but to 'determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'" *Id.* (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985)).

## DISCUSSION

### A.    Article III Standing

Federal courts are courts of limited jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). They possess only the authority expressly granted by the U.S. Constitution and by statute. *Id.* For this reason, it is presumed that a case lies outside a federal court's jurisdiction, and the party seeking to avail itself of the court's jurisdiction has the burden to establish that it exists. *Id.*; *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Article III of the U.S. Constitution limits federal courts' adjudication powers to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. And a dispute does not count as a constitutional case or controversy if the plaintiff lacks Article III standing—that is, a concrete stake in the outcome. *Town of Chester, N.Y. v.*

11

*Laroe Estates, Inc.*, 581 U.S. 433, 438 (2017).  A plaintiff must "demonstrate standing for each claim they seek to press."  *California v. Azar*, 911 F.3d 558, 570 (9th Cir. 2018).  At the summary judgment stage, a plaintiff must "set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true."  *Lujan*, 504 U.S. at 561 (cleaned up).

Plaintiffs assert a theory of associational—or "representational"—standing, under which they can sue on behalf of their members even if the organizations themselves have not suffered an injury.  *Fleck & Assocs., Inc. v. City of Phoenix*, 471 F.3d 1100, 1105 (9th Cir. 2006).  To establish Article III associational standing, Plaintiffs must establish that (1) at least one of their members would have standing to sue in their own right, (2) the interests at stake are germane to the organizations' purpose, and (3) neither the claims asserted nor the relief requested requires the individual members to participate in the suit.  *Id.* at 1105-06.  To show member standing, in turn, Plaintiffs must demonstrate that at least one of their members (1) has suffered an injury in fact, (2) that is fairly traceable to the defendants' challenged conduct, and (3) that is likely redressable through a favorable judicial decision.  *Lujan*, 504 U.S. at 560-61.

The scientific, cultural, spiritual, recreational, and other interests at stake in this lawsuit over commercial fishing in a national monument are unquestionably germane to the purpose of Kāpaʻa, which is an association of Native Hawaiian cultural practitioners that was formed "to support the creation, protection, and expansion of

12

the" Monument and "to oppose efforts to remove" its protections.  ECF No. 14-1, at

PageID.155 (Solomon Pili Kahoʻohalahala Decl.).  They are also germane to the

environmental nonprofit Plaintiffs' purposes.  *See, e.g.*, ECF No. 14-2, at PageID.166

(Jonnetta Peters Decl.) (stating that the Conservation Council for Hawaiʻi's mission is

"to protect for future generations Hawaiʻi's native wildlife, . . .  and to restore the

ecosystems on which [threatened and endangered] species depend," including within

the Monument); ECF No. 14-7, at PageID.190 (Maxx Phillips Decl.) (explaining that the

Center for Biological Diversity is "dedicated to the protection of native, threatened and

endangered species and their habitats").  It is also undisputed that nothing indicates

that the claims asserted or the relief requested requires Plaintiffs' individual members

to participate in this suit.  And so the court turns to the question of whether at least one

of Plaintiffs' members would have standing to sue in their own right, which is the

disputed element here.

    1.  Plaintiffs allege injuries arising from the agency's failure to engage in the

notice-and-comment rulemaking required by the Magnuson Act and the APA before

asserting that the ban on commercial fishing in the Monument Expansion was gone.  To

adequately assert an injury in fact for Article III purposes, plaintiffs must show not only

deprivation of a procedural right, but also that "some concrete interest . . . is affected by

the deprivation."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009).  In

environmental cases, the concrete interest requirement is generally satisfied if any

member has an adequate "aesthetic or recreational interest in a particular place, or animal, or plant species" and can show that their interest is "impaired" by the challenged action. *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1147 (9th Cir. 2000). In most cases, the injury must be actual or imminent. *Lujan*, 504 U.S. at 560. "Where plaintiffs allege a 'procedural injury,'" however—"that is, that the government's violation of a procedural requirement could impair some separate interest of the plaintiffs'—the normal standards for the immediacy of injury are relaxed." *Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1160 (9th Cir. 2017) (cleaned up) (quoting *Lujan*, 504 U.S. at 572 n.7). Under the relaxed standards, Plaintiffs need only demonstrate (1) that they have a procedural right that, if exercised, could have protected their concrete interests, (2) that the procedures in question are designed to protect those concrete interests, and (3) that the challenged action's threat to their concrete interests is reasonably probable. *Azar*, 911 F.3d at 570. To satisfy the first two of these prongs, "environmental plaintiffs must allege that they will suffer harm by virtue of their geographic proximity to and use of areas that will be affected by" the challenged action. *California v. Bernhardt*, 460 F. Supp. 3d 875, 890 (N.D. Cal. 2020) (citing *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 971 (9th Cir. 2003)).

The injuries Plaintiffs assert here are sufficient to meet Article III's relaxed standard for procedural injury. At least one of Plaintiffs' members have concrete cultural, spiritual, religious, subsistence, educational, scientific, professional,

recreational, or aesthetic interests in the Monument Expansion area.  *See* ECF No. 14-1

(Kahoʻohalahala Decl.); ECF No. 14-2 (Peters Decl.); ECF No. 14-3 (Brian Zgliczynski

Decl.); ECF No. 14-7 (Phillips Decl.); ECF No. 14-8 (Stuart A. Sandin, Ph.D, Decl.); *see*

*also Nat'l Fam. Farm Coal. v. EPA*, 966 F.3d 893, 909 (9th Cir. 2020) (noting that plaintiffs

"who use the area threatened by a proposed action . . . have little difficulty establishing

a concrete interest" (cleaned up)).  Moreover, Plaintiffs have statutory procedural rights

in notice-in-comment rulemaking that, if exercised, could have protected their concrete

interests in the Monument Expansion by ensuring that public comment was taken into

account and by potentially changing the specific regulations on different types of

commercial fishing; notice and comment procedures are designed to protect these

concrete interests; and the threat to Plaintiffs' concrete interests arising from NMFS

authorizing commercial fishing is reasonably probable.  *See, e.g.*, ECF No. 14-14, at

PageID.258 (Alan M. Friedlander Decl. ¶ 49) (attesting that "[e]ven a small amount of

fishing in the Monument Expansion threatens significant harms to ecosystems and

species").[3]

---

[3]    According to an unrebutted scientific opinion submitted by Plaintiffs,
commercial fishing harms ecosystems and species in the Monument Expansion through
the (1) "indirect effects of harvesting targeted species (*i.e.*, tunas) on seabird foraging
dynamics"; (2) "direct effects of bycatch on many declining or listed species including
sea turtles, sharks, and seabirds"; and (3) "direct effects of derelict fishing gear and
vessel pollution on ecosystems and species."  ECF No. 14-14, at PageID.258 (Friedlander
Decl. ¶ 49).

2.   Once a plaintiff has established a procedural injury, the causation and

redressability elements of member standing are relaxed.  *Azar*, 911 F.3d at 571.  The

government nonetheless presses on the element of causation; it argues that Plaintiffs'

injuries are not fairly traceable to the letter because it is the President's Proclamation,

and not the agency's letter, that lifted the commercial fishing ban in the Monument

Expansion.  ECF No. 23, at PageID.3758-60.

That argument is not convincing.  While it is true that the agency's letter must be

a "substantial factor" in causing Plaintiffs' injuries, *Novak v. United States*, 795 F.3d 1012,

1019 (9th Cir. 2015) (cleaned up), it is equally true that "causation does not require that

the defendant's unlawful conduct be the *only* cause of the alleged injury," *Nat. Res. Def.

Council v. EPA*, 38 F.4th 34, 55 (9th Cir. 2022) (emphasis added).  And the government's

own submissions show that commercial fishing did not begin in the Monument

Expansion area based on the Proclamation alone.  The government represents that

NMFS had received at least sixteen inquiries from longline vessel owners or

operators—that is, commercial fishers—asking whether they could legally fish in the

Monument Expansion area following the Proclamation.  ECF No. 28, at PageID.3826

(Defs.' CSF ¶ 4); *see also* ECF No. 23, at PageID.3770.  This evidence shows that the

status of commercial fishing in the Monument Expansion area following the

Proclamation was unclear to permit holders.  It was unclear in part because the

Proclamation directed NMFS to take action:  while the Proclamation stated that "the

16

Secretary of Commerce shall not prohibit commercial fishing within the" Monument

Expansion, it directed the Secretary of Commerce to "take appropriate action . . . to

implement this proclamation."  ECF No. 14-29, at PageID.857.  As a result, commercial

fisheries were apparently unwilling to take the risk of fishing based on the

Proclamation alone.  Against this backdrop, the letter had significant consequences—it

informed permit holders that they could immediately commence commercial fishing in

the area, and that they need not wait for NMFS to use notice and comment procedures

to repeal the prohibition in existing regulations.  The evidence shows that permit

holders then acted on those representations:  while no commercial fishing took place in

the Monument Expansion between the issuance of the Proclamation on April 17, 2025,

and that of the letter on April 25, 2025, commercial fishing operations commenced after

the letter was issued.  *See* ECF No. 14-14, at PageID.256-58 (Friedlander Decl. ¶¶ 47-48)

(cataloguing commercial fishing in the Monument Expansion since the April 25, 2025,

letter).

Granted, Plaintiffs' injuries are most immediately being caused by these

commercial fishing operations, which are not parties to this suit; there is no allegation

that the government is itself engaged in commercial fishing in the Monument

Expansion.  And harms by third parties can sometimes be too attenuated from the

challenged conduct to establish causation for the purposes of Article III.  For an injury

to be "fairly traceable" to the government's conduct, for example, it must not be the

result of the entirely independent choices of a third party. *Lujan*, 504 U.S. at 562. That is why, for example, the district court in *Cary v. Hall* held that a plaintiff who suffered injury because of the sport hunting of wild antelope in North Africa (where he worked with them) could not show a sufficient causal connection to a regulation authorizing the taking of captive-bred antelope in the United States. No. C 05-4363, 2006 WL 6198320, at *5-7 (N.D. Cal. Sept. 30, 2006). As that court observed, "the challenged regulation neither authorizes sport hunting in North Africa nor authorizes the importation of trophies taken in the wild," and so the "causal connection" between the regulation and injury was "too speculative" and reliant on "the unfettered decisions of third parties." *Id.* at *7.

But other times, the choices of third parties are not independent of government action. When a plaintiff "adduce[s] facts showing that those choices have been or will be made in such a manner" as to reflect that they are substantially being caused by government action, the causation element is satisfied. *Lujan*, 504 U.S. at 562. That can be the case, for example, when a plaintiff's Article III standing argument "relies instead on the predictable effect of Government action on the decisions of third parties." *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019); *see also Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1517-18 (9th Cir. 1992) (rejecting the argument that the plaintiffs' injury was not caused by a government action but instead would ultimately be "the result of a confluence of factors, including the actions of . . . private parties,"

18

because the "third parties could not undertake their future actions *but for* the challenged decision").  Following this reasoning, the district court in *WildEarth Guardians v. Chao* found sufficient evidence of a causal connection where a plaintiff suffering injury from the conduct of pipeline operators challenged the government's failure to cause annual inspections of pipelines.  454 F. Supp. 3d 944, 947 (D. Mont. 2020).  As the court explained, the "fact that pipeline operators' actions or decisions may constitute a step in the causation chain does not mean the injury is not 'fairly traceable' to" the agency where "the alleged injury [wa]s 'produced by determinative or coercive effect upon the action of someone else.'"  *Id.* (quoting *Bennett v. Spear*, 520 U.S. 154, 169 (1997)).  That was especially so, the court observed, because the government had offered no evidence that, in the absence of annual inspections, "pipeline operators either are complying, or are failing to comply, with regulations."  *Id.*; *see also Mendia v. Garcia*, 768 F.3d 1009, 1012-13 (9th Cir. 2014) (finding causation where the chain of events linking the defendant's conduct to the injury was plausible, even if indirect or not the final step**).**

Here, Plaintiffs have made a similarly sufficient showing on causation.  They produced evidence that permit holders inquired about the lawfulness of commercial fishing following the Proclamation; that the agency issued its formal letter stating that the ban on commercial fishing had been lifted without the need for notice-and-comment rulemaking; and that permit holders began fishing only after they had received this firm and sweeping reassurance.  This record is sufficient to establish that the

19

commercial fishing now occurring in the Monument Expansion—the conduct most immediately causing Plaintiffs' concrete injury—was "produced by [the] determinative or coercive effect [of NMFS's letter] upon the action" of commercial fishing operations. *WildEarth Guardians*, 454 F. Supp. 3d at 947 (quoting *Bennett*, 520 U.S. at 169).

Additionally, Plaintiffs correctly point out that the Proclamation itself did not delineate what types of commercial fishing practices should be allowed in the Monument Expansion. It instead found only that "*appropriately managed* commercial fishing would not put objects of scientific and historic interest" at risk. ECF No. 14-29, at PageID.857 (emphasis added). It left the "implementation of any regulation of commercial fishing" to the Secretary. *Id.* And while it restricted the Secretary from banning commercial fishing altogether, it also directed the Secretary to "take appropriate action" to "implement" the Proclamation, "to regulate fisheries, and to ensure proper care and management of the Monument Expansion." *Id.* That is, the Secretary could still implement specific regulations to regulate the scope and types of commercial fishing, even while he was required to "amend or repeal all burdensome regulations that restrict commercial fishing" in the Monument Expansion. *Id.* at PageID.858. Plaintiffs suggest that NMFS could have, for example, set catch limits on fishing in the Monument Expansion; set a maximum number of hours for commercial fishing; increased its observer coverage on commercial fishing boats; or banned particular types of commercial fishing, such as the allegedly particularly harmful

20

longline and purse seine fishing techniques.  But NMFS instead chose to take the

position in its letter that the regulations banning commercial fishing were immediately

eliminated, and that it had no need to bother with notice and comment procedures to

accomplish that result.  It therefore effectively took the position that specific types of

commercial fishing, such as longline and purse seine fishing, are immediately

permissible within the Monument Expansion's waters, even though NMFS has not yet

engaged in notice and comment procedures to assess whether they are consistent with

"appropriately managed" commercial fishing in those waters.  The use of longline and

purse seine fishing in the Monument Expansion, then, is "fairly traceable" to the legal

position NMFS asserted in its letter.  *WildEarth Guardians*, 454 F. Supp.3d at 947.

Because the letter is the substantial cause of both commercial fishing in the

Monument Expansion and the use of the commercial fishing practices that Plaintiffs

allege are especially destructive, the court concludes that Plaintiffs have amply

demonstrated a sufficient causal connection between the letter and their asserted injury.

3.  In a similar vein, the government argues that Plaintiffs' requested relief—

striking down the letter—would not redress their asserted injuries because it is the

Proclamation, and not the letter, that authorizes commercial fishing in the Monument

Expansion area.  In the government's view, the letter did no more than "inform

commercial fishery permit holders of the content of [President Trump's] Proclamation."

ECF No. 23, at PageID.3761. And so even if the court found in Plaintiffs' favor on these claims, the government posits, Plaintiffs' injury would not be redressed.

Because Plaintiffs assert procedural injuries, they need only prove that the substantive result *could* have been different had NMFS followed the proper procedures for notice and comment—not that it certainly *would* be. *See Azar*, 911 F.3d at 571. The government's line of reasoning falls short for reasons similar to those that fell its causation arguments. It is likely that setting aside the letter would redress Plaintiffs' injuries, both because fisheries are evidently relying on the letter—and so at least some are likely to stop fishing if the letter is set aside—and because the missing notice and comment procedures could conceivably result in a more limited set of commercial fishing operations allowed in the Monument Expansion than the letter's sweeping authorization of *all* commercial fishing previously allowed outside the Monument Expansion.

For these reasons, the court concludes that Plaintiffs have met their burden of establishing that they have Article III standing to assert the Magnuson Act and APA claims for which they seek summary judgment.[4]

---

[4]    Plaintiffs—whose members include experts who wish to make submissions during any notice and comment procedure—have also amply demonstrated that they fall within the zone of interests protected by these statutes, *see Sierra Club v. Trump*, 929 F.3d 670, 702-03 (9th Cir. 2019), which is likely why the government does not argue otherwise.

B.      The Availability of Judicial Review

Because Plaintiffs have shown that they possess Article III standing, they have

established that Congress *could* constitutionally authorize this court to exercise judicial

review of the agency conduct they challenge.  Their remaining burden is to show that

Congress *has* done so here.

One potential source of authority is Section 1855(f) of the Magnuson Act, which

authorizes judicial review for two categories of agency action if a petition for review is

filed within thirty days:  (1) "[r]egulations promulgated by the Secretary" under the

Act, and (2) "actions that are taken by the Secretary under regulations which implement

a fishery management plan, including but not limited to actions that establish the date

of closure of a fishery to commercial or recreational fishing."  16 U.S.C. § 1855(f)(1), (2).

But the government argues—and Plaintiffs agree—that § 1855(f) does not apply here

because the letter is neither a "promulgated" regulation nor an action taken under one.

ECF No. 23, at PageID.3762-65 (Defs.' Opp.); ECF No. 29, at PageID.3862-63 (Pls.'

Reply).  A regulation is "promulgated" within the meaning of § 1855(f) only "when

published in the Federal Register."  *Turtle Island Restoration Network v. U.S. Dep't of

Com.*, 438 F.3d 937, 943-44 (9th Cir. 2006) (cleaned up).  And all parties agree that no

such publication occurred here.  Indeed, Plaintiffs' Magnuson Act claim rests on that

very failure:  Plaintiffs argue that NMFS should not have adopted the position it

23

announced in the letter without first publishing a proposed regulation in the Federal Register and complying with notice and comment procedures.

The fact that § 1855(f) is inapplicable here, however, does not mean that no judicial review is available for Plaintiffs' Magnuson Act claim. Even when § 1855(f) does not apply, judicial review of a Magnuson Act claim may be available under the APA, which authorizes judicial review of final agency action "for which there is no other adequate remedy in a court."[5] 5 U.S.C. § 704; *see also N.C. Fisheries Ass'n v. Gutierrez*, 550 F.3d 16, 21 (D.C. Cir. 2008) (recognizing that APA review "would appear" to be available for final agency action that violates the Magnuson Act). And while § 1855(f) excludes Plaintiffs' claims from judicial review under that provision, nothing in the Magnuson Act precludes APA review here. *See Bennett*, 520 U.S. at 177-78 (confirming that "[n]othing in the" Endangered Species Act's "citizen-suit provision" precluded "review under the APA"). And so the court's jurisdiction over the merits of

---

[5]     Because § 1855(f) imposes a thirty-day time limit on seeking judicial review, the Ninth Circuit has held that parties cannot avoid its restraints simply by declining to mention the Magnuson Act in their complaint (and, for example, seeking review only under the APA). *See Turtle Island Restoration Network*, 438 F.3d at 944-45. But § 1855(f) and its restrictions apply only to *promulgated* regulations, given the "highly detailed and public process leading up" to their adoption. *Id.* at 947-48. As the Ninth Circuit has explained, § 1855(f) does not exempt from judicial oversight environmental claims related to commercial fisheries that do *not* challenge promulgated regulations. *Id.* at 948-49. There are many classes of claims "left untouched by § 1855(f)," *id.* at 949—this is one of them.

both of Plaintiffs' claims here—the Magnuson Act claim and the claim brought under the APA itself—turns on the APA's judicial review provision.

The APA embodies a "strong presumption favoring judicial review of administrative action." *Cmty. Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Hum. Servs.*, 137 F.4th 932, 939 (9th Cir. 2025) (quoting *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015)). Even so, the APA grants courts jurisdiction to review only "final agency action." 5 U.S.C. § 704. And here, while Plaintiffs maintain that NMFS's letter qualifies as final agency action within the meaning of the APA, the government contends that it does not.

### 1.    Agency Action

The government first argues that the letter is not agency action at all. ECF No. 23, at PageID.3766. Agency action under the APA is defined as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). And an agency rule, in turn, is broadly defined to include a "statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." *Id.* § 551(4). This definition includes interpretive rules as well as binding rules with the force of law. *Waterkeeper All. v. EPA*, 140 F.4th 1193, 1206 (9th Cir. 2025).

The letter in this case reflects a statement of the agency's position on the lawfulness of commercial fishing in the Monument Expansion. Whether that statement

is a binding rule or an interpretive one—that is, whether it is designed to implement, interpret, or prescribe law—it is plainly agency action within the meaning of the APA. *See id.* (concluding that an EPA report constituted a rule because it "plainly reflect[ed] a statement of the agency's position with respect to" the Clean Water Act).

The government separately argues that the letter was not action taken by the agency because it was issued by the Regional Administrator, and not the Secretary. ECF No. 23, at PageID.3769. In making this argument, the government relies on the principle that a court may not exercise judicial review over the merely tentative ruling of a "subordinate official." *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992) (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 151 (1967)). And to be sure, the Regional Administrator is not the *highest* ranking official within the Department of Commerce; in that sense, she is "subordinate" to some other officials. But she is not a lowly official lacking authority to bind the agency; she is a high-ranking official with substantial authority. The Magnuson Act defines "Secretary" to mean "the Secretary of Commerce *or his designee.*" 16 U.S.C. § 1802(39) (emphasis added). The Secretary has delegated the primary responsibility to manage United States fisheries to NMFS. And the Pacific Islands Regional Administrator, in particular, has the delegated authority to approve, disapprove, and implement fishery management plans. ECF No. 30-2, at PageID.3894; *see S. Cal. Aerial Advertisers' Ass'n v. Fed. Aviation Admin.*, 881 F.2d 672, 675 (9th Cir. 1989) (rejecting argument that judicial review was not available because the challenged

26

letter was authored by the agency's Assistant Manager rather than the Secretary where the agency was charged with carrying out the Secretary's duties for aviation safety).

Moreover, there is nothing in the record that suggests the Regional Administrator acted out of line; all signs point to the letter representing the position of the agency. Consider, for example, the sequence of events leading up to the letter's issuance. The vessel owners and operators had not initially reached out to the Regional Administrator herself with the inquiries that the government says instigated the April 25, 2025, letter; instead, they had contacted a NMFS Fisheries Management Specialist, who then notified his supervisors of the inquiries. ECF No. 28-1, at PageID.3832-33 (Jason Mehlinger Decl. ¶¶ 3-5). The Specialist's call log, moreover, indicates that he informed these permit holders that an "official" letter from the agency was forthcoming. ECF No. 28-2, at PageID.3834. And the letter was sent out not only to those who made the initial inquiries, but to all permit holders in the Hawaiʻi and American Samoa longline fisheries and to all U.S. purse seine vessel owners operating in the Western and Central Pacific Ocean. ECF No. 30, at PageID.3875 (Pls.' Further CSF ¶ 1).

The language of the letter itself is also instructive. By its plain terms, it speaks on behalf of the agency: it says that "*[w]e* plan to expeditiously initiate rulemaking to bring fishing regulations into compliance" with President Trump's Proclamation. ECF No. 14-22, at PageID.795 (emphasis added); *accord City of San Diego v. Whitman*, 242 F.3d

1097, 1102 n.7 (9th Cir. 2001) (rejecting government's contention that an EPA letter "represents only the 'regional administrator's opinion'" because the letter stated it was an "EPA interpret[ation]" (emphasis omitted)).  And the letter directs permit holders with questions to reach out not to the Regional Administrator herself, but to the Assistant Regional Administrator.  ECF No. 14-22, at PageID.795.  These are not the words one would expect to find in a letter meant to reflect only the views of a single individual; they strongly indicate that the Regional Administrator was writing for the agency, rather than herself alone.

What is more, the record establishes that after the letter was issued, others within the agency treated it as the agency's official position.  For example, the contents of the letter were published on NMFS's official website on a news webpage.  ECF No. 30-3, at PageID.3896-97.  The webpage says only that the user is on "[a]n official website of the United States government" and that it was "[l]ast updated by the Pacific Islands Regional Office" on April 25, 2025; it says nothing to suggest that the statement represents the views only of the Regional Administrator, let alone that the Regional Administrator was acting only on her own behalf in issuing the letter.  *Id.*

And while the government emphasizes that the Regional Administrator lacked the authority to *promulgate* formal regulations, there is no evident reason why she would have lacked the authority to announce the agency's position that commercial fishing could commence before any formal regulations are promulgated.  In any case,

28

the government's points about the Regional Administrator's delegated powers have little force here, given that actors who admittedly do have the authority to issue formal regulations—including the Secretary himself—have fully embraced the substance of the Regional Administrator's letter in this court. The Secretary of Commerce, the Acting Administrator of NOAA, and the Assistant Administrator of NOAA are all named Defendants in this case, and the government's summary judgment briefing was filed in each of their names. And their brief wholeheartedly adopts the letter's position that the commercial fishing prohibitions codified at 50 C.F.R. Part 665, subpart H, were wiped away by President Trump's Proclamation and that NMFS therefore had no need to repeal those existing regulations using notice and comment procedures. *E.g.*, ECF No. 23, at PageID.3766 ("The letter merely communicated that [President Trump's] Proclamation . . . lifted the restriction on commercial fishing within the Monument Expansion area."). Accordingly, while the government emphasizes that the Regional Administrator lacks some of the formal authority that Defendants in this case possess, it would "be adherence to a mere technicality to give any credence to this contention." *Abbott Lab'ys*, 387 U.S. at 152 (rejecting the government's contention that a Commissioner's action did not speak for the Attorney General where there was "no representation that the Attorney General and the Commissioner disagree," and "the Justice Department is defending this very suit").

29

## 2.    Final Agency Action

The government next argues that even if the letter is agency action, it is not

"final" agency action.  The Supreme Court has explained that "two conditions must be

satisfied for agency action to be 'final.'"  *Bennett*, 520 U.S. at 177.  The first of these is

that "the action must mark the consummation of the agency's decisionmaking process,"

and "must not be of a merely tentative or interlocutory nature."  *Id.* at 177-78 (cleaned

up).  The second condition is that "the action must be one by which rights or obligations

have been determined, or from which legal consequences will flow."  *Id.* at 178 (cleaned

up).  The analysis of these conditions "requires focus on the practical and legal effects of

the agency action, not on labels, and finality is interpreted in a pragmatic and flexible

manner."  *Waterkeeper All.*, 140 F.4th at 1207 (cleaned up).

A common way to approach this question is to "look to whether the action

amounts to a definitive statement of the agency's position or has a direct and immediate

effect on the day-to-day operations of the subject party, or if immediate compliance

with the terms is expected."  *Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5

F.4th 997, 1007 (9th Cir. 2021).  In so doing, courts generally distinguish between

"informational" documents "that merely provide[] the agency's interpretation of a

statute," *Advanced Integrative Med. Sci. Inst., PLLC v. Garland*, 24 F.4th 1249, 1258 (9th Cir.

2022) (citing *Whitman*, 242 F.3d 1097), and agency "decision[s]" that "determine[] how a

statute or regulation applies to facts for enforcement purposes," *id.* (citing *U.S. Army*

*Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599-600 (2016)).  Given the "pragmatic"

nature of the inquiry, the form of a document is not dispositive.  *Id.* at 1260 (quoting

*Hawkes*, 578 U.S. at 599).  If a document, viewed with appropriate sensitivity to context,

is akin to "the type of workaday advice letter that agencies prepare countless times per

year in dealing with the regulated community, and is little more than a restatement of

statute and regulations in a response to a request for assistance," then it is not final

agency action.  *Id.* (cleaned up).  If, on the other hand, the document is "issued after

extensive factfinding, or after a public hearing, or after a series of formal written

notices," or if circumstances otherwise indicate that the agency has bound itself to a

particular course of action—such as a new threat of sanctions or the extension of a safe

harbor—it falls within the APA's definition of final agency action.  *Id.* (citations

omitted).

    A few examples are illustrative of this distinction.  In *United States Army Corps of

Engineers v. Hawkes Co.*, 578 U.S. 590, the Supreme Court held that a jurisdictional

determination, or "JD," issued by the Army Corps of Engineers, which gave the

agency's definitive view on whether a particular piece of property contained wetlands

subject to the Clean Water Act, was final agency action.  On the first *Bennett* prong, the

Court noted that the JD undisputedly "mark[ed] the consummation of the Corps'

decisionmaking process" because it was "issued after extensive factfinding" and would

"typically not [be] revisited."  *Id.* at 597-98 (cleaned up).  For "all practical purposes,"

then, the agency had "ruled definitively that respondents' property contain[ed] jurisdictional waters."  *Id.* at 598 (cleaned up).

On the second *Bennett* prong, the Supreme Court determined that the JD's "definitive nature" gave "rise to 'direct and appreciable legal consequences.'"  *Id.* (quoting *Bennett*, 520 U.S. at 178).  The Court explained that a JD stating that a party's property does not contain jurisdictional waters—or a "negative" JD—would effectively create a "safe harbor" from civil enforcement proceedings under the Clean Water Act because the government had firmly committed to abide by such a determination for a period of five years. *Id.*  Similarly, the Court reasoned, "affirmative" JDs "have legal consequences as well:  they represent the denial of the safe harbor that negative JDs afford."  *Id.* at 599 (quoting 5 U.S.C. § 551(13), for the definition of "agency action" as an agency "rule, order, license, sanction, relief, or the equivalent," or the "denial thereof").  The court therefore concluded that affirmative JDs constitute final agency action.  *Id.*

On the other side of the coin is *Advanced Integrative Medical Science Institution, PLLC v. Garland*, a Ninth Circuit case involving a letter sent by the Drug Enforcement Administration (DEA) in response to an attorney's letter seeking guidance on how a physician could administer a drug without incurring liability under the Controlled Substances Act.  24 F.4th at 1252.  Concluding that the letter did not constitute final agency action, the Ninth Circuit explained that unlike in *Hawkes*, there was no indication that the agency "engaged in a decisionmaking process resulting in the

response letter," and that the letter "did no more than point to the plain language of existing law." *Id.* at 1261. The letter did not commit the DEA to non-enforcement of any law, and it thus granted no safe harbor. Because it instead merely provided guidance on existing law, and imposed no legal consequences of its own, a physician relying on the letter would "face liability only for noncompliance" with the underlying Act, "not for disagreement with the agency's determination." *Id.* (cleaned up). Accordingly, any legal risk or consequences did not flow from the letter itself, and the letter did not meet *Bennett*'s second condition for final agency action. *Id.* at 1261-62.[6]

### a.  The First *Bennett* Condition

We turn now to the case at hand, beginning with *Bennett*'s first prong: whether the letter marks the consummation of NMFS's decisionmaking process. *See Bennett*, 520 U.S. at 177-78. The determinative question here is whether the letter "merely facilitates the *beginning* of the [agency's] review process for proposed agency action" or whether it reflects the consummation of it. *Advanced Integrative*, 24 F.4th 1258 (cleaned up).

---

[6]    In a second *Advanced Integrative* opinion, the Ninth Circuit considered whether the DEA's subsequent letter denying the medical clinic's requests for formal authorization to access a controlled substance and for immunity from prosecution was final agency action. *Advanced Integrative Med. Sci. Inst., PLLC v. DEA*, 128 F.4th 1133, 1142-43 (9th Cir. 2025). This time around, the Ninth Circuit concluded that the letter constituted final agency action. *Id.* Unlike the earlier letter, which merely provided guidance on the law, the new letter constituted a final decision on the clinic's requests. *Id.* at 1142. And it had legal consequences because it established the clinic's "rights—or lack thereof—to access" the drug. *Id.* at 1142-43.

In the letter, NMFS takes a definitive position on the commercial fishing allowed in the Monument Expansion. The letter unequivocally states that "commercial fishing is no longer prohibited in certain areas of the" Monument. ECF No. 14-22, at PageID.795. And it goes on to say that the "federal regulations at 50 CFR §§ 665.933(a) and 665.934(a) implementing [President Obama's Proclamation's] commercial fishing prohibition are no longer effective between 50-200 nautical miles around Wake Island, Johnston Atoll, and Jarvis Island." *Id.* This is not a tentative or equivocal stance—it is a definitive position that the existing regulations prohibiting commercial fishing in the Expansion area are gone, and that commercial fishing is therefore immediately authorized. Nothing about the letter suggests that the issue is still being considered, nor does the government represent that it is. *See Hawkes*, 578 U.S. at 597. To commercial fisheries, then—at least some of whom, the record shows, acted in reliance on NMFS's letter—"there was probably not much about this that felt 'merely tentative.'" *S.F. Herring Ass'n v. U.S. Dep't of the Interior*, 946 F.3d 564, 578 (9th Cir. 2019) (quoting *Bennett*, 520 U.S. at 178); *see also id.* at 579 ("Simply put, an agency engaging in merely tentative or interlocutory thinking does not state a definitive position in formal notices, confirm that position orally, and then send officers out into the field to execute on the directive." (cleaned up)).

Granted, the letter is missing some of the traditional hallmarks of deliberative process. There is no showing, for example, that the letter was preceded by agency

factfinding, *see Advanced Integrative*, 24 F.4th at 1260 (citing *Hawkes*, 578 U.S. at 597), or a

public hearing, *see id.* (citing *Frozen Food Express v. United States*, 351 U.S. 40, 41 (1956)).

But remember that the assessment of finality is not an exercise in formalisms, and while

these are useful reference points, they are not alone determinative—especially in a case

such as this one, where Plaintiffs' claims raise legal, not factual, issues, and rest on the

lack of statutorily required process.  To hold that the agency's action is unreviewable

because it failed to use formal procedures, at least in these circumstances, would be to

allow the agency to elide judicial review by doing the opposite of what is alleged to

have been required.

       But, the government responds, the agency may well do what is required in the

future:  the letter expressly contemplated that the promulgation of formal regulations

would follow.  ECF No. 23, at PageID.3767 (citing *Whitman*, 242 F.3d at 1101-02).  It is

true that the letter states that NMFS "plan[s] to expeditiously initiate rulemaking to

bring fishing regulations into compliance with" President Trump's Proclamation.  ECF

No. 14-22, at PageID.795.  That fact could bear heavily on the finality analysis in other

cases.  It carries little weight here, however, because the government itself characterizes

anticipated formal rulemaking as merely "housekeeping" updates to the regulations.

ECF No. 23, at PageID.3767.  The fact that the government believes "housekeeping"

remains to be done does not change the fact that NMFS's letter marked the

consummation of its substantive decisionmaking.[7]  Instead, it tends to confirm that the

government has already made its decision, and that it views any subsequent actions as

a mere formality.  For "all practical purposes," then, NMFS's letter reflects a final

decision on commercial fishing in the Monument Expansion.  *Hawkes*, 578 U.S. at 598.

And once such a final decision has been made, there is final agency action; it matters not

that the "agency [might] need to do something similar again in the future."  *Waterkeeper*

*All.*, 140 F.4th at 1207.  The first of *Bennett*'s considerations is satisfied.

> **b.    The Second *Bennett* Condition**

The remaining question on final agency action—the second *Bennett* prong—is

whether the letter determined "rights or obligations" or gave rise to "direct and

appreciable legal consequences."  *Bennett*, 520 U.S. at 178.  Here the government

contends that the letter "merely communicated that [President Trump's] Proclamation .

. . lifted the restriction on commercial fishing within the Monument Expansion area."

ECF No. 23, at PageID.3766.  And so, the government posits, as in *Advanced Integrative*,

the letter did no more than express its view of what the law—in this case, the

---

[7]     Deferring judicial review until the government enacts its "housekeeping"
regulations, moreover, would risk leaving Plaintiffs "without the possibility of judicial
review," given that commercial fishing has already begun in the Monument Expansion
in the wake of NMFS's letter and that it remains unclear whether NMFS will
expeditiously—or ever—undertake notice and comment procedures to conform existing
regulations to its current position.  *Saliba v. SEC*, 47 F.4th 961, 968 (9th Cir. 2022)
(concluding that an agency decision on sanctions was final, viewed in a "pragmatic and
flexible manner," because a "failure to review these sanctions now could foreclose
appellate review . . . in the future" (cleaned up)).

Proclamation—requires; it did not have any independent legal consequences.  *See* 24

F.4th at 1259 (citing *Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs*, 543 F.3d 586,

594 (9th Cir. 2008)).  The flaw in the government's position is that the Proclamation is

most naturally read as doing no more than directing the Secretary to engage in notice-

and-comment rulemaking to undo the existing regulations on commercial fishing.  The

Proclamation states that "[b]etween 50 to 200 nautical miles from the landward

boundaries of the Monument, the Secretary of Commerce shall not prohibit commercial

fishing."  ECF No. 14-29, at PageID.857.  And it directs the Secretary to "take

appropriate action" to "implement" the Proclamation and to "expeditiously publish

new proposed rules in the *Federal Register* to amend or repeal all burdensome

regulations that restrict commercial fishing"—it does not state that the regulations are

hereby amended or repealed.  *Id.*

 Had the Proclamation instead sought to immediately repeal formal regulations

by its own force, it could easily have said so.  That much is clear from the fact that the

Proclamation *does* say that it is immediately revising language in President Obama's

2014 proclamation.  As President Trump's Proclamation puts it, in no uncertain terms,

"[a]ll language under the section entitled 'Management of the Marine Monument' in

[President Obama's] Proclamation . . . is deleted and replaced with the following," and

it then lays out new text to replace what has been deleted.  ECF No. 14-29, at

PageID.857.  Given that the Proclamation uses language bringing about an immediate

37

revision in a prior proclamation, it is significant that the Proclamation does not use comparable language when issuing its directives to the Secretary.  The Proclamation does not announce that existing formal regulations are "deleted."  It is instead forward-looking:  it directs the Secretary to take further action "to amend or repeal" these regulations.  *Id.* at PageID.858.

Lacking any grounding in the text of the Proclamation, the government also points to the prior proclamations of President Bush and President Obama, which it says carried immediate effects.  The 2009 proclamation establishing the Monument, for example, directed the Secretary to "prohibit commercial fishing within boundaries of the monument."  74 Fed. Reg. at 1568.  And following that proclamation, NMFS issued a letter to permit holders in which it took the position that President Bush's proclamation had the effect of immediately prohibiting commercial fishing within the Monument's boundaries.  The 2009 letter stated that "the commercial fishing prohibitions and other terms set out in the Presidential Proclamation[] became immediately effective upon issuance of the Proclamation[] on January 6th.  Accordingly, all commercial fishing within the waters of the . . . marine National Monument[] . . . is now prohibited."  ECF No. 21-4, at PageID.1362 (AR at 000463).  The 2014 proclamation expanding the Monument similarly directed the Secretary to "prohibit commercial fishing within the boundaries of the Monument Expansion."  79 Fed. Reg. at 58647.

Even assuming the 2009 and 2014 proclamations did have immediate effect, however, those proclamations are poor precedent for the government's current position. That is because those prior proclamations did not purport to repeal existing formal regulations that had been passed through notice-and-comment rulemaking. The prior proclamations, therefore, offer no support to the government's current position that President Trump's Proclamation did just that.

Indeed, the government has offered no case or other precedent for the proposition that the President *could* repeal formal regulations through a proclamation alone. The government nonetheless asserts that this result follows from the fact that a President's proclamation, issued under the Antiquities Act, has the force of law. There is no need here to doubt that President Trump's Proclamation, if valid, is binding law. *Cf. Indep. Meat Packers Ass'n v. Butz*, 525 F.2d 228, 234 (8th Cir. 1975) ("Presidential proclamations and orders have the force and effect of laws when issued pursuant to a statutory mandate or delegation of authority from Congress."). But the government's assertion begs the question of whether the President, even in creating law under the Antiquities Act, is required to ensure that notice and comment procedures are used to repeal a formal regulation that had been promulgated using formal procedures. *See* 54 U.S.C. § 320301 (authorizing the President to declare national monuments and reserve federal lands, but not explicitly to repeal existing formal regulations without process). Requiring as much would not necessarily restrict the power of the President in a broad

39

sense; it would instead enable the President to make credible commitments that an

opportunity for notice and comment will be afforded before a formal regulation is

repealed.  The ability to make credible commitments is often viewed as advancing one's

autonomy, rather than impeding it.  *Cf.* Hanoch Dagan & Michael Heller, *Special*

*Performance:  On Freedom and Commitment in Contract Law*, 98 Notre Dame L. Rev. 1323,

1353 (2023) (recognizing that "some degree of stability is essential for people's plans to

be meaningful," even if "plans need not be *fully* immune from changes").  And so there

is a serious question whether Congress, in granting the President impressive powers

under the Antiquities Act, would have meant to deprive the President of this one.

But here, the court need not—and therefore does not—resolve whether a

Presidential proclamation under the Antiquities Act *could* lawfully repeal formal

regulations without using notice and comment procedures.  It is sufficient to conclude

that President Trump's Proclamation is best interpreted as not purporting to do so.

That is, the text of the Proclamation is not fairly read as an effort to free the Secretary of

Commerce from the burden of using notice and comment procedures to repeal the

existing regulatory ban.  While government counsel asserted at the hearing that this

was indeed the underlying "intention" of the Proclamation, only a strained reading of

the language of the Proclamation would support that inference.  The court cannot

conclude that the Proclamation sought to tee up a substantial question about the

President's power under the Antiquities Act "in so cryptic a fashion."  *Food & Drug*

40

*Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000).  It is often said that

Congress does not "hide elephants in mouseholes."  *Whitman v. Am. Trucking Ass'ns*,

531 U.S. 457, 468 (2001).  There is no reason to conclude that a President would either.

Which brings us back to NMFS's letter.  By asserting that the Proclamation

immediately eviscerated existing regulations prohibiting commercial fishing in the

Monument Expansion—even though it did no such thing—the letter did not merely

take the plain and unremarkable step of restating or describing existing law.  It instead

asserted a startling conclusion:  that the existing regulations promulgated via notice and

comment procedures were immediately eliminated by the Proclamation itself, even

though nothing in the Proclamation's text supports that view, and even though the

Proclamation directed the agency to make proper use of notice and comment

procedures to implement its directives.  By asserting this position, NMFS's letter created

new, substantive legal consequences that had not already been established by the

Proclamation.

These significant legal consequences come in two forms.  First, the letter carries

legal consequences because it effectively announces a safe harbor for commercial

fisheries who rely on it.  That is to say, the letter commits the agency to the position that

the formal regulations have already been repealed, and thus effectively reflects its

commitment to non-enforcement of regulations that are still on the books.  A

commitment to non-enforcement of that variety is sufficient to create legal

41

consequences.  In *Hawkes*, for example, the court concluded that a "negative"

jurisdictional determination creates a "safe harbor" from civil enforcement proceedings

under the Clean Water Act because the government commits to follow that

determination for five years.  578 U.S. at 598.  Here, the agency's commitment to

nonenforcement is even more sweeping than that discussed in *Hawkes*:  NMFS's letter

does not merely commit the government to not enforcing the commercial fishing

prohibitions against permit holders in the Monument Expansion for a set amount of

time.  It instead takes the position that the prohibitions are gone entirely—and, hence,

that they could *never* be used against permit holders who engage in commercial fishing

in the Monument Expansion, because there is nothing for the government to enforce.

Second, even apart from its announcement of a safe harbor for commercial

fishing operations (in the form of a government commitment to non-enforcement), the

letter carries legal consequences because it creates a possible basis for an estoppel

defense.  Were the government to later try to change its position and enforce the

existing regulations prohibiting commercial fishing (despite its having announced the

position that those regulations no longer exist), permit holders could credibly argue that

the government should be estopped from enforcing the regulations because they

reasonably relied on the agency's letter.  That is because "[w]hen an authorized

government official tells the defendant that a course of action is legal and the defendant

reasonably relies to its detriment on that erroneous representation, then fairness and

42

due process may prohibit the state from punishing the defendant for that unlawful conduct." *Fairbanks*, 543 F.3d at 596 n.12 (noting that an Army Corps statement that a property is not a jurisdictional wetland subject to permitting requirements under the Clean Water Act could be the basis for an estoppel defense).[8]

In light of these significant legal consequences, moreover, it is notable that the Ninth Circuit has already recognized that an agency's position on the legality of fishing, viewed pragmatically, has sufficient legal consequences to satisfy *Bennett*'s second prong. In *San Francisco Herring Association v. United States Department of the Interior*, the Ninth Circuit held that National Park Service orders to individual fishermen to stop fishing met *Bennett*'s second prong because there was no dispute that persons who engaged in commercial fishing "could be punished through fines and imprisonment." 946 F.3d at 580. That expectation of "immediate compliance" with an agency directive and attendant exposure to liability suffices to establish that legal consequences flow

---

[8]     This is not to suggest that "legal novelty alone establishes finality." *Valero Energy Corp. v. EPA*, 927 F.3d 532, 537 (D.C. Cir. 2019). An agency would not engage in final agency action by expressing a novel legal perspective while making clear that its view is tentative and "binds no one." *Id.* (noting that the agency document at issue in that case made "clear that it ha[d] no binding effect on how [the agency] will conduct future reviews"); *see also Ctr. for Biological Diversity v. Haaland*, 58 F.4th 412, 417 (9th Cir. 2023) (concluding that the EPA's adoption of a recovery plan was not final agency action because such plans merely "provide guidance" and are not treated by the agency as "binding authorities" (cleaned up)). But here, the agency letter asserts a nonobvious interpretation of the Proclamation—one that appears to be unsupported by the text of the Proclamation and, indeed, inconsistent with it—which firmly commits the agency to afford a safe harbor from enforcement. Under these circumstances, significant legal consequences flow from the letter itself.

43

from an agency action. *Id*. As *Hawkes* made clear, both the denial of a safe harbor and the creation of one can constitute legal consequences for final agency action purposes. And this case presents the flipside of *San Francisco Herring Association*—an agency has tied its hand, and unless the letter is set aside, commercial fisheries might reasonably rely on the letter to avoid liability under the existing regulations banning commercial fishing in the Monument Expansion.

At bottom, NMFS's letter is not "the type of workaday advice letter that agencies prepare countless times per year in dealing with the regulated community." *Advanced Integrative*, 24 F.4th at 1260 (cleaned up). Far from a routine correspondence, the letter creates a safe harbor for commercial fishing operations: it announces a firm agency commitment to non-enforcement (through the assertion that those regulations no longer exist) and thus carries significant legal consequences all on its own. A letter of that variety, viewed pragmatically and flexibly, is final agency action. The court is therefore satisfied that it has the statutory authority to review the legality of the letter, and it turns to that issue next.

### C.    Notice-and-Comment Rulemaking

On the merits, Plaintiffs' contention is that NMFS's letter was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). In the claims at issue here—claims five and six of the complaint—Plaintiffs contend that NMFS's failure

44

to engage in the legally required notice and comment procedures violated both the

Magnuson Act and the APA.

The Magnuson Act was enacted "as a response to overfishing and inadequate

conservation measures that were threatening future commercial and recreational

fishing, as well as the survival of a number of species of fish." *Or. Trollers Ass'n v.

Gutierrez*, No. Civ. 05–6165, 2005 WL 2211084, *1 (D. Or. Sept. 8, 2005) (citing 16 U.S.C.

§ 1801(a)).  The Act's purposes include "to conserve and manage the fishery resources

found off the coasts of the United States," "to promote domestic commercial and

recreational fishing under sound conservation and management principles," and to

provide for "fishery management plans."  16 U.S.C. § 1801(b)(1), (3), (4).  Rulemaking

under the Magnuson Act "is subject to the APA's notice and comment provisions." *Or.

Trollers Ass'n*, 2005 WL 2211084, *1.  In short, then, Plaintiffs contend that both the

Magnuson Act and the APA require the same notice and comment procedures.

The APA embodies Congress's judgment that "notions of fairness and informed

administrative decisionmaking require that agency decisions be made only after

affording interested persons notice and an opportunity to comment." *Paulsen v. Daniels*,

413 F.3d 999, 1004 (9th Cir. 2005) (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 316

(1979)).  To that end, it "requires agencies to follow certain procedures when it decides

to issue a rule." *Id.*  Those procedures are "(1) publishing notice of the proposed rule-

making in the *Federal Register*, 5 U.S.C. § 553(b); (2) providing a period for interested

persons to comment on the proposed rule, which comments will be considered by the agency prior to adopting the rule, *id.* at § 553(c); and (3) publishing the adopted rule not less than thirty days before its effective date, with certain exceptions that are not applicable here, *id.* at § 553(d)." *Id.* It is "antithetical to the structure and purpose of the APA for an agency to implement a rule first, and then seek comment later." *Id.* at 1005.

To be sure, not all final agency action requires notice-and-comment rulemaking. By its own terms, the APA's notice-and-comment requirement generally "'does not apply' to 'interpretative rules.'" *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015) (quoting 5 U.S.C. § 553(b)(A)). Unlike legislative rules, interpretive rules "do not have the force and effect of law." *Id.* at 97 (cleaned up). The "critical feature of interpretive rules is that they are issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *Id.* (cleaned up). And so even though the letter reflects a mistaken interpretation of the Proclamation (given that, as explained above, the Proclamation itself has not repealed existing regulations), and even though the letter has brought about significant legal consequences because of its legal error (and so is subject to judicial review), the question remains whether the letter nonetheless could be promulgated without notice and comment procedures because it is merely interpretive in nature.

Admittedly, this determination can sometimes be a close call. In *Golden Gate Bridge, Highway & Transportation District v. United States Department of Labor*, No. 24-cv-

04985, 2025 WL 371800, at *1 (N.D. Cal. Feb. 3, 2025), for example, the government

issued a letter responding to an engineer's request for clarification about a scaffolding

regulation.  The district court determined the letter was merely an interpretive rule with

no force of law, for there was no evidence that the agency was "enforcing the

underlying regulation any differently than it did before the issuance of the" letter, nor

that it had taken any action "based on the allegedly new interpretation of the

regulation."  *Id.* at *4.

In this case, however, the government has chosen not to defend on the merits of

notice-and-comment rulemaking.  It has chosen not to advance an argument that the

letter is an interpretative rule rather than a legislative one.  The court therefore is not

asked to make a judgment call:  the government has chosen to forfeit any argument that

notice and comment procedures were unnecessary.  *See, e.g.*, *Bernstein v. Virgin Am., Inc.*,

365 F. Supp. 3d 980, 985 (N.D. Cal. 2019) (explaining that a party who has a "full and

fair opportunity to ventilate its views" on summary judgment, but chooses not to

pursue an argument, has abandoned it); *Boulware v. Dunstan*, 334 F. App'x 61, 62 (9th

Cir. 2009) (issue not raised in brief was forfeited).  It follows, as a consequence, that

Plaintiffs succeed on the merits of their claims.

## D.    Remedy

That leaves the question of remedy.  The APA authorizes courts to "hold

unlawful and set aside" invalid agency action.  5 U.S.C. § 706(2).  In the Ninth Circuit,

vacatur and remand is permissible and, indeed, is the presumptive remedy for agency action that violates the APA, *Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1, 50 (9th Cir. 2025), and that is the relief Plaintiffs seek here, *see* ECF No. 13, at PageID.142-45.

That said, there has been robust judicial and academic discussion about whether—the Ninth Circuit's precedent notwithstanding—the APA truly authorizes district courts to wholesale vacate agency action, or whether courts may only set aside agency action with respect to the specific plaintiffs in a suit.  In his concurrence in *United States v. Texas*, for example, Justice Gorsuch likened vacatur of agency actions to universal injunctions, both of which he concluded might exceed district courts' authority under the APA.  599 U.S. 670, 693-704 (2023) (Gorsuch, J., concurring in the judgment).  He opined that to properly "set aside" an agency action under the APA means only to "disregard" it in a particular case, not to "vacate" it for every case.  *Id.* at 695-96; *see also Arizona v. Biden*, 40 F.4th 375, 396-97 (6th Cir. 2022) (Sutton, J., concurring) ("Use of the 'setting aside' language does not seem to tell us one way or another whether to nullify illegal administrative action or not to enforce it in the case with the named litigants.").  *See generally* Mila Sohoni, *The Power to Vacate A Rule*, 88 Geo. Wash. L. Rev. 1121 (2020).  *But see Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 830-31 (2024) (Kavanaugh, J., concurring) (opining that the APA authorizes vacatur of unlawful agency actions, and cataloguing decisions affirmed by the Supreme Court that vacated agency actions rather than merely enjoining the

48

enforcement of rules against specific plaintiffs); *Nat'l TPS All. v. Noem*, 773 F. Supp. 3d

807, 866-67 (N.D. Cal. 2025) (distinguishing between universal injunctions and vacatur

of agency actions).

But as the Supreme Court observed in *Trump v. CASA, Inc.*, even if wholesale

vacatur is not always appropriate, there are times when it is necessary to afford

complete relief to the plaintiffs in a case.  145 S. Ct. 2540, 2557 n.12 (2025)

(acknowledging that "[t]here may be other injuries for which it is all but impossible for

courts to craft relief that is complete *and* benefits only the named plaintiffs").  Relief for

racially gerrymandered congressional maps, for example, falls into this boat.  *Id.* (citing

*Shaw v. Hunt*, 517 U.S. 899 (1996)).  And there is every reason to conclude that this case

does so, too:  the only way to provide complete relief (or at least the fullest relief the

court can afford) for the injuries Plaintiffs assert is to vacate the letter in its entirety, so

that no commercial fishing operators may reasonably rely on it.

In any event, the court need not resolve these questions because it is bound by

Ninth Circuit precedent that authorizes universal vacatur of unlawful agency action

and treats it as the presumptive remedy.  The government, moreover, has decided not

to advance any argument against Plaintiffs' chosen equitable remedy, and it has

therefore forfeited any argument on this issue.  The letter is therefore vacated in the

universal sense that Ninth Circuit precedent authorizes.

## CONCLUSION

The President has concluded that appropriately managed commercial fishing should be allowed within the Monument Expansion. Persons of good faith might agree or disagree with the President's conclusion.

But this court does not sit in judgment of the wisdom of that policy. The only questions presented here are legal ones: whether Plaintiffs have the procedural right to make the agency hear them out on the question of what restrictions are needed to ensure that commercial fishing in the Monument Expansion is indeed appropriately managed (and to have that opportunity before commercial fishing is given the green light), and whether Plaintiffs have the right to vindicate their asserted procedural right in court.

For the reasons set out above, the court has concluded that Plaintiffs have the right to present their legal claims in court—that is, they have Article III standing, and the APA authorizes this court to exercise judicial review of their claims. And as to whether Plaintiffs' claims are correct—whether Plaintiffs are right to contend that they are entitled to participate in a notice and comment procedure—the government has chosen to concede that they are.

Accordingly, Plaintiffs' motion for summary judgment on its fifth and sixth claims for relief, ECF No. 13, is GRANTED, and the National Marine Fisheries Service's April 25, 2025, letter is hereby VACATED.

IT IS SO ORDERED.

DATED:  August 8, 2025, at Honolulu, Hawai'i.



Micah W.J. Smith
United States District Judge

---

Civil No. 25-00209 MWJS-WRP; *Kāpa'a*, et al. *v. Donald J. Trump*, et al.; ORDER
GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT RE: FIFTH AND
SIXTH CLAIMS FOR RELIEF

51